# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ENTEGRIS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-10601 GAO |
| | ) | |
| PALL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

# PALL'S OPPOSITION TO
# ENTEGRIS' MOTION FOR PRELIMINARY INJUNCTION

---

# TABLE OF CONTENTS

I.    BRIEF PROCEDURAL BACKGROUND ................................................................ 1

II.   INTRODUCTION AND SUMMARY .................................................................... 1

III.  FACTUAL BACKGROUND ................................................................................ 3

    A.    Entegris' Predecessors Adopted Known Technology to Serve the Familiar
        Needs of the Microelectronics Manufacturing Industry ......................................... 3

    B.    The '667 Patent Claims Do Not Require the Feature of "Automatic"
        Alignment that the Court Found Key to the Subject Matter Described in
        the Patent .......................................................................................................... 4

    C.    When Both the Court and the Patent Examiner Found Entegris' Claims
        Unpatentable Over the Two-Connector Prior Art, Entegris Simply
        Declared the Invention to be Three Connectors with a Vent ................................. 8

    D.    The Prior Art is Replete with Quick-Connecting Filter Assemblies having
        Three Connectors with a Vent ............................................................................. 9

    E.    The Jenkins Reference, Cited as Anticipatory by the Patent Office but
        Withdrawn for Failure to Qualify as Prior Art under Section 102(e), Does
        Qualify as a Prior Invention under Section 102(g) ............................................. 12

    F.    Entegris Secured Claim 24 Ostensibly Covering the Internal Structures of
        Pall's EZD-3 Filter Capsules through a Misrepresentation to the Patent
        Office .............................................................................................................. 13

IV.   ARGUMENT .................................................................................................... 15

    A.    A Preliminary Injunction would Severely Disrupt the Market ............................ 15

    B.    Entegris will Not Likely Succeed on the Merits Because the Asserted
        Claims of the '667 Patent are Invalid in View of the Prior Art ........................... 17

        1.    Claim Construction of the Independent Claims ......................................... 17

        2.    Independent Claim 1 is Anticipated by the Prior Art ............................... 20

        3.    Independent Claims 2, 14 and 25 are Obvious in View of the Prior
            Art ....................................................................................................... 21

            a.    The Level of Ordinary Skill in the Art ........................................... 22

            b.    The Scope and Content of the Prior Art .......................................... 22

            c.    The Difference between the Prior Art Ogden Patent and
               Independent Claims 2, 14 and 25 is Insubstantial .......................... 24

            d.    No Secondary Considerations of Nonobviousness Exist .............. 26

e.    The Recent Revocation of Nearly Identical Claims by the European Patent Office is Further Evidence of the Likely Invalidity of the '667 Patent Claims ................................................ 27

4.    The Remaining Dependent Claims are Also Invalid ................................. 28

a.    Claim 10 ................................................................................... 28

b.    Claim 11 ................................................................................... 29

c.    Claims 3, 13, 22 and 27 ........................................................ 29

d.    Claims 5-8, 26, 28 and 29 ..................................................... 29

e.    Claims 9 and 21 ..................................................................... 30

f.    Claims 12 and 15-20 .............................................................. 31

g.    Claim 24 ................................................................................... 32

5.    Claim 24 is Invalid for Lack of Written Description ................................. 33

C.    Entegris is Not Entitled to a Presumption of Irreparable Harm ............................ 35

D.    Entegris Presents No Evidence of Actual Irreparable Harm ................................ 36

E.    A Balancing of the Hardships Weighs Heavily Against a Preliminary Injunction ................................................................................................................ 38

F.    A Preliminary Injunction would be Contrary to the Public Interest .................... 39

G.    Entegris Cannot Invoke the Court's Equitable Powers ......................................... 40

1.    Entegris' Claim is Barred by Prosecution Laches .................................... 40

2.    Entegris Engaged in Inequitable Conduct before the Patent Office to Procure Claim 24 of the '667 Patent ..................................................... 42

V.    CONCLUSION ........................................................................................................... 44

# TABLE OF AUTHORITIES

## Cases

*Advanced Display Sys., Inc. v. Kent State Univ.*,
212 F.3d 1272 (Fed. Cir. 2000) ................................................................. 33

*Archive Corp. v. Cipher Data Prod. Inc.*,
12 U.S.P.Q.2d 1464 (C.D. Cal. 1988) .......................................................... 16

*Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*,
326 F.3d 1226 (Fed. Cir. 2003) ................................................................. 39

*Cardinal Chem. Co. v. Morton Int'l, Inc.*,
508 U.S. 83 (1993)................................................................................. 37

*Cummins-Allison Corp. v. Glory, Ltd.*,
No. Civ.A. 02C7008, 2003 WL 22125212 (N.D. Ill. Sept. 5, 2003).................. 38, 39

*Deleo v. Zconnexx Corp.*,
No. 00-CV-0319E(F), 2000 WL 1610668 (W.D.N.Y. Oct. 25, 2000)................... 16

*eBay Inc. v. MercExchange, L.L.C.*,
--- U.S. ---, 126 S.Ct. 1837, No. 05-130, 2006 WL 1310670 (May 15, 2006)......... 34

*Ethicon Endo-Surgery v. U.S. Surgical Corp.*,
855 F. Supp. 1500 (S.D. Ohio 1994) .......................................................... 37

*Frommelt Indus., Inc. v. W.B. McGuire Co., Inc.*
504 F. Supp. 1180 (N.D.N.Y. 1981)........................................................... 35

*Genentech, Inc. v. Novo Nordisk, A/S*,
108 F.3d 1361 (Fed. Cir. 1997) ................................................................. 15

*Gentry Gallery, Inc. v. Berkline Corp.*,
134 F.3d 1473 (Fed. Cir. 1998) ................................................................. 32

*Gov't Ctr. Camera, Inc. v. U.S.*,
No. 87-2208-S, 1987 WL 28337 (D. Mass. Nov. 5, 1987)................................ 16

*Graham v. John Deere Co. of Kansas City*,
383 U.S. 1, 86 S. Ct. 684 (1966)................................................................ 21

*Illinois Tool Works, Inc. v. Grip-Pak, Inc.*,
906 F.2d 679 (Fed. Cir. 1990) ................................................................. 35

*In re Baker Hughes Inc.*,
215 F.3d 1297 (Fed. Cir. 2000) ................................................................. 37

*In re Deminski*,
796 F.2d 436 (Fed. Cir. 1986) ................................................................. 22

*In re Gorman*,
933 F.2d 982 (Fed. Cir. 1991) ................................................................. 22

*In re Paulsen*,
30 F.3d 1475 (Fed. Cir. 1994) ............................................................. 22, 23

*In re Vaeck*,
  947 F.2d 488 (Fed. Cir. 1991) ................................................................ 23

*In re Wilder*,
  736 F.2d 1516 (Fed. Cir. 1984) .............................................................. 32

*Intel Corp. v. ULSI Sys. Tech., Inc.*,
  995 F.2d 1566 (Fed. Cir. 1993) .............................................................. 37

*J.P. Stevens & Co., Inc. v. Lex Tex, Ltd., Inc.*,
  747 F.2d 1553 (Fed. Cir. 1984) .............................................................. 40

*Neutrino Dev. Corp. v. Sonosite, Inc.*,
  410 F. Supp. 2d 529 (N.D. Ill. 2006) ..................................................... 40

*New Idea Farm Equip. Corp. v. Sperry Corp.*,
  916 F.2d 1561 (Fed. Cir. 1990) .............................................................. 20

*Newell Co., Inc. v. Kenney Mfg. Co.*,
  864 F.2d 757 (Fed. Cir. 1988) ................................................................ 25

*Novo Nordisk of North America, Inc. v. Genentech, Inc.*,
  77 F.3d 1364 (Fed. Cir. 1996) ................................................................ 37

*Nutrition 21 v. U.S.*,
  930 F.2d 867 (Fed. Cir. 1991) ................................................................ 35

*Para-Ordinance Mfg., Inc. v. SGS Imp. Int'l, Inc.*,
  73 F.3d 1085 (Fed. Cir. 1995) ................................................................ 23

*Ralston Purina Co. v. Far-Mar-Co, Inc.*,
  772 F.2d 1570 (Fed. Cir. 1985) .............................................................. 32

*Roper Corp. v. Litton Sys., Inc.*,
  757 F.2d 1266 (Fed. Cir. 1985) .............................................................. 34

*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*,
  264 F.3d 1344 (Fed. Cir. 2001) .............................................................. 21

*Sierra Club v. Larson*,
  769 F. Supp. 420 (D. Mass. 1991) ......................................................... 36

*Symbol Techs., Inc. v. Lemelson Med. Educ. & Res. Found., LP*,
  422 F.3d 1378 (Fed. Cir. 2005) ......................................................... 38, 39

*Tanner Motor Livery, Ltd. v. Avis, Inc.*,
  316 F.2d 804 (9th Cir. 1963) .................................................................. 15

*Texas Instruments Inc. v. Tessera, Inc.*,
  231 F.3d 1325 (Fed. Cir. 2000) .............................................................. 15

*Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.*,
  60 F.3d 27 (2d Cir. 1995) ....................................................................... 16

*Turbocare Div. of Demag Delaval Turbomachinary Corp. v. Gen. Elec. Co.*,
  264 F.3d 1111 (Fed. Cir. 2001) .............................................................. 40

**Statutes**

35 U.S.C. § 102 ................................................................................................ 19

35 U.S.C. § 102(g) ........................................................................................... 20

35 U.S.C. § 102(g)(2) ....................................................................................... 20

35 U.S.C. § 103 ........................................................................................... 21, 23

35 U.S.C. § 112 ........................................................................................... 32, 34

35 U.S.C. § 132 ........................................................................................... 32, 40

35 U.S.C. § 283 ................................................................................................ 37

**Rules**

37 C.F.R. § 1.121(f) ......................................................................................... 32

Defendant Pall Corporation ("Pall") respectfully submits this memorandum in opposition to Entegris, Inc.'s ("Entegris") motion for preliminary injunction. Entegris moves to enjoin Pall's PhotoKleen<sup>TM</sup> EZD-3 Filter Assemblies (the "EZD-3") that have been on the market since mid-2004 based on the alleged infringement of its U.S. Patent No. 7,021,667 ("the '667 patent," Ex. 1) that issued on April 4, 2006. Entegris' motion is without merit because Pall's EZD-3 filter assemblies do not infringe any valid claim of the '667 patent.

## I.    BRIEF PROCEDURAL BACKGROUND

The '667 patent issued from an application filed in 2003 that claimed the priority of the application that resulted in U.S. Patent Nos. 6,068,770 ("the '770 patent," Ex. 2) and 6,378,907 ("the '907 patent," Ex. 3) filed seven years earlier. In Civil Action No. 03-10392 GAO ("the 2003 action") between Pall and Entegris' predecessor Mykrolis Corp. (formerly Millipore Corp.), in an order dated April 30, 2004 (2003 Docket No. 66), the Court issued a preliminary injunction against Pall's EZD-2 filter assemblies. In an order dated January 12, 2005 (2003 Docket No. 106), the Court dissolved the preliminary injunction and held that Pall's EZD-3 products raised substantial issues of non-infringement and that the '770 and '907 patents were likely invalid in view of the prior art. Appeals from the January 12, 2005 order are pending.

## II.    INTRODUCTION AND SUMMARY

The Court should deny Entegris' motion for preliminary injunction because the asserted claims are invalid in view of the prior art. In the 2003 action, Entegris argued and the Court found that "automatic alignment" was the key aspect of the invention described by the '770 and '907 patents. In response, Pall eliminated automatic alignment in the accused EZD-3 products.

Rather than engaging in head-to-head competition against Pall's non-aligning and non-infringing EZD-3 products, Entegris conducted an extreme makeover of its '770 and '907 patents via continuation applications that it had kept pending long after the issuance of both patents. Once Entegris learned that Pall eliminated automatic alignment in its EZD-3 products, Entegris responded by eliminating automatic alignment from the continuation application that resulted in

1

the '667 patent.  Entegris replaced the key automatic alignment feature with an inconsequential limitation requiring the manifold to quick-connect with three connectors on one end of a filter. Since both quick connection and having all of the active connectors on one end of a filter were indisputably well-known, Entegris effectively patented the number three.

The three-connector "invention" of the '667 patent is clearly not patentable.  As Pall demonstrates below, three-connector quick-connect assemblies were well known in the prior art. As confirmation, the '667 patent admits that three or more connectors and their function were common and have been matters of obvious design choice since before the Entegris "invention." As further confirmation, in March 2006 (before the '667 patent issued), the European Patent Office revoked Entegris' European patent based on lack of invention over the prior art, including three-connector claims substantially identical to those in Entegris' '667 patent.  Ex. 4.

An injunction now would severely disrupt the market and would create a new market condition where Entegris would hold a tight monopoly.  Pall's EZD-3 products have been on the market for two years.  Entegris never indicated to Pall or to the Court during the 2003 action that the purported invention of the '770 and '907 patents (and hence the '667 patent) was not actually automatic alignment and could cover Pall's non-aligning EZD-3 assemblies, or that it was pursuing broad claims in the '667 patent application without automatic alignment.  After two years of competition, Entegris' silence is diametrically opposed to any presumption or assertion that it would suffer irreparable harm absent a preliminary injunction.

Further, Entegris' eight-year symphony of continuations and amendments before ultimately pursuing the claimed subject matter of the '667 patent in 2005 was improper and an abuse of the patent system.  Entegris' "submarine" activities were not necessitated by any Patent Office prosecution.  Rather, Entegris was responding to Pall's elimination of automatic alignment in the EZD-3 products.  Entegris' lengthy delay presents a classic case of prosecution laches, and bars this action.  Entegris also engaged in inequitable conduct before the Patent

Office when it ostensibly claimed the internal structures of Pall's filter capsules, despite knowing that it did not support such claims.

Respectfully, the Court should deny Entegris' motion for preliminary injunction.

## III.     FACTUAL BACKGROUND

Pall submits herewith the declaration of Professor Igor Paul who explains in detail the technical evidence relied upon by Pall in its opposition.  Ex. 5.  Pall also submits the declaration of Stephen Geibel, a Chief Technology Officer at Pall and experienced filter designer, to explain some aspects of filter capsule design (Ex. 6) and the declaration of Michael Mesawich of Pall to describe market conditions and the impact of a preliminary injunction (Ex. 7).  Finally, Pall submits the declarations of Mr. Dan Jenkins (Ex. 8), and his patent attorney Mr. Frank Zugelter (Ex. 9), to describe Mr. Jenkins' prior invention anticipating claim 1 of the '667 patent.

### A.     Entegris' Predecessors Adopted Known Technology to Serve the Familiar Needs of the Microelectronics Manufacturing Industry

Quick-connect manifolds have been around since at least the mid-1970s to permit quick and easy change-out of filters without the need for the user to handle the sometimes-noxious fluids entrained within the filter cartridge.  *See, e.g.*, Ex. 5H (Ogden Patent).  As of the mid-1990s, quick-connect manifold assemblies enjoyed widespread use in multiple industries.  *See, e.g.*, Ex. 5H-Q (various prior art references discussed further below).

By the early- to mid-1990s, the microelectronics manufacturing industry was enduring significant criticism and had experienced a string of worker lawsuits due to the noxious chemicals used in the manufacturing process.  Ex. 7, Mesawich Decl., ¶ 17, Ex. 5E, Fisher, J., "Poison Valley Sunday" (2001).  These chemicals purportedly caused birth defects and other health problems.  *Id*.  As part of a new safety conscience, the industry reduced the toxicity of some of the process chemicals and sought to reduce the exposure to the chemicals by its workers in the manufacturing lines or "tracks."  *Id*.

Entegris' predecessor, Millipore, was the dominant filtration company servicing the microelectronics industry during the mid-1990s. Apparently, in 1995 to mid-1996, in the process of replacing its existing pump and integral filter combination, Millipore introduced a new fluid pump with an integral filter that incorporated the well-known quick-connect manifold design. *See* Entegris Mem., p. 3. As with the other well-known quick-connect manifolds, Millipore's quick-connect manifold assemblies afforded the typical quick change-outs while minimizing exposure to the processed fluids.

Millipore filed for a patent on its quick-connect manifold design that resulted in the '770 and '907 patents (and ultimately the '667 patent). In the 2003 action, the Court held that both the '770 and '907 patents are likely invalid in view of the virtually identical prior art quick-connect manifolds dating back to the 1970s. *See* 2003 Docket No. 106, January 12, 2005 Order.

**B.     The '667 Patent Claims Do Not Require the Feature of "Automatic" Alignment that the Court Found Key to the Subject Matter Described in the Patent**

Faced with invalid patents that did not cover Pall's EZD-3 products, Entegris returned to the Patent Office and performed a makeover of its '770 and '907 patents. Through a process known to practitioners as "continuation practice," Entegris had kept Millipore's 1996 application alive up to and during the 2003 action. In doing so, Entegris abused the patent system by lying-in-wait unreasonably for over seven years until pursuing the claims of the '667 patent. The following timeline indicates some of the events that transpired during and since the 2003 action and Entegris' strategic responses to those events in the Patent Office:



As shown in the timeline, the '667 patent issued from an application filed on May 16, 2003 as a continuation of an application filed on February 20, 2002, still pending as U.S. Patent Application No. 10/079,360 ("the '360 application"). The '360 patent is a divisional of the application that resulted in the '907 patent filed on July 10, 1998. Hence, the '667 and '907 patents share an identical description of the "invention." The '907 patent itself is a continuation-in-part of the application that resulted in the '770 patent filed on July 12, 1996.

The first hint that something was wrong with effectively reopening prosecution on its earlier '770 and '907 patents is reflected in the Summary of Invention of the '667 patent. According to the Summary of the Invention, the invention of the '667 patent is a fluid separation module without the separation element, *i.e.*, a "dummy" capsule, used to purge the fluid processing system without expending a functional filter capsule.

> The present invention provides a connector apparatus [dummy capsule] which can be substituted for a separation module in a system for dispensing a filtered fluid composition. … The connector apparatus is nonworking in that it performs no function other than transferring fluid therethrough. ….

Ex. 1, col. 3, ll. 3-14.  Only claim 23 of the '667 patent, one of only two claims not asserted by Entegris, even refers to dummy capsules or systems using dummy capsules.  Instead, every claim at issue of the '667 patent requires a fluid separation module instead of a dummy capsule.  Confirming the abandonment of automatic alignment, only dependent claim 9 requires automatic alignment features.

In April 2003, during the 2003 action, Pall cited as anticipatory prior art U.S. Patent No. 3,727,764 ("Ogden") (reproduced on the left).  Ex. 5H, Ogden, Fig. 3.  Pall urged that Ogden disclosed the elements of claim 1 of the '907 patent calling for a means for retaining, positioning, locking and unlocking.  Entegris argued that Ogden could not anticipate the claims of the '770 and '907 patents because it did not disclose automatic alignment.  While the '907 patent did not expressly claim automatic alignment, Entegris argued that automatic alignment was such a key aspect of the invention that the feature was necessarily implicit in every claim.  The Court agreed and distinguished Ogden on that basis alone.



As shown in the timeline, Entegris filed the '667 patent application in May 2003, less than a month <u>after</u> Pall presented Ogden to the Court as an anticipatory reference to the '907 patent.  Entegris immediately cancelled all of the application claims directed to the dummy capsules and added new claims directed to a manifold requiring automatic alignment.  For example, in application claim 8 (which became independent claim 2 of the '667 patent, the claim focused on in Entegris' brief), Entegris added what it considers automatic alignment:

> 8 (ultimately patent claim 2).  A quick-connect manifold assembly for a disposable fluid separation module, ... the module receptor adopted

> to support a disposable fluid separation module <u>in alignment</u> with the fluid
> connector member ....

Ex. 10, May 16, 2003 Preliminary Amendment (underline added for emphasis).

Later, in response to Entegris' argument and the Court finding that automatic alignment was a key aspect of the invention, Pall removed the automatic alignment features from the presently accused EZD-3 filter assemblies.  Ex. 7, Mesawich Decl., ¶¶ 3-8; *see also* 2003 Docket No. 75, Pall's Report Regarding Compliance with the Preliminary Injunction.  Pall informed both the Court and Entegris of the non-aligning and non-infringing EZD-3 design in late May 2004.  *See* 2003 Docket No. 75, Pall's May 28, 2005 Report Regarding Compliance with the Preliminary Injunction.  Back in the Patent Office, in July 2004, Entegris responded to Pall's elimination of automatic alignment in the EZD-3 products by again amending the claims—this time by deleting automatic alignment.

> 8 (ultimately patent claim 2).  A quick-connect manifold assembly
> for a disposable fluid separation module, ... the module receptor ~~adopted
> to support~~ <u>receiving</u> a disposable fluid separation module <u>having a second
> set of connectors,</u> ~~in alignment with the fluid connector member~~ ....

Ex. 10, July 2004 Amendment (underlines indicate additions relative to earlier version of claim; strikethroughs indicate deletions relative to earlier version of claim).  Entegris' maneuvers are transparent in hindsight.  Entegris added automatic alignment to the claims of its predecessor's patent application when it feared that the Court might not agree that the automatic alignment claims of the '770 and '907 patent required it, and then eliminated automatic alignment after Pall began to sell its non-aligning and clearly non-infringing EZD-3 filter assemblies.  Even as it was extolling the virtues of automatic alignment to the Court, Entegris never made its intentions known to the Court or Pall that it intended to seek and enforce claims without the key feature of automatic alignment.

C.    **When Both the Court and the Patent Examiner Found Entegris'
        Claims Unpatentable Over the Two-Connector Prior Art, Entegris
        Simply Declared the Invention to be Three Connectors with a Vent**

After Pall had redesigned its products in mid-2004 to eliminate any automatic alignment, Pall discovered the prior art Sumitomo publications, which expressly disclosed the key feature of automatic alignment.  Figures from the Sumitomo '201 publication are set forth below.  Ex. 5K, Sumitomo, Figures 1 and 2 (replicated).



Pall moved to dissolve the injunction based upon the invalidity of the claims in view of the Sumitomo publications alone or in combination with Ogden.  *See* 2003 Docket No. 89, Pall's Motion to Dissolve the Preliminary Injunction.  On January 12, 2005, the Court found Entegris' '770 and '907 patents likely invalid over the Sumitomo and Ogden references.  *See* 2003 Docket No. 106, Memorandum and Order, p. 12.

Back in the Patent Office, on March 3, 2005, the Patent Office rejected all but one of Entegris' pending '667 patent claims as anticipated by the Sumitomo references, and rejected the other claim as obvious over the Sumitomo references.  Given the fact that Pall had redesigned its products to eliminate any automatic alignment anyway, Entegris needed a new patent with a new "invention."  In the place of the key automatic alignment feature, Entegris again amended its

claims to call for a quick-connect manifold with three connectors, where one connector functions as a gas vent.  For example, application claim 8 (now patent claim 2), as amended on April 8, 2005, is set forth in part below:

> 8 (now claim 2).  A quick-connect manifold assembly for a disposable fluid separation module, comprising: a fluid connector member ~~having~~ <u>comprising</u> a first set of <u>at least three</u> connectors extending through the fluid connector member ... <u>and at least one connector of the first set of connectors is for venting a gas from the disposable fluid separation module.</u>

Ex. 10, April 8, 2005 Amendment (underlines indicate original additions relative to earlier version of claim; strikethroughs indicate original deletions relative to earlier version of claim).  Entegris argued that the amendment overcame Sumitomo because it disclosed two connectors.  Ex. 10, April 8, 2005 Amendment.  After some further changes to the language about the three connectors and venting, the Patent Office allowed the claims and the '667 patent issued.  The Patent Office never even postulated that the "at least three connector" claims were obvious in view of the two-connector prior art and numerous examples of three-connector prior art among the 230 references submitted during prosecution of the '667 patent application.

### D.    The Prior Art is Replete with Quick-Connecting Filter Assemblies having Three Connectors with a Vent

As sometimes clearly happens, the Patent Office made a mistake.  The Patent Office should not have allowed Entegris' claims directed to three connectors and a vent.  As to the vent connector requirement, venting of a filter is a fundamental design criterion inasmuch as fluids cannot enter a module without first evacuating the entrapped air.  Ex. 6, Geibel Decl., ¶ 3.  According to Mr. Geibel, all filter modules like those at issue and described in the prior art must vent gas in order to function properly.  *Id*. at ¶ 3.  The prior art Ogden patent itself discloses a gas vent extending from the inlet connector.  Ex. 5, Paul Decl., ¶ 19.  The vent requirement of the '667 patent claims is inconsequential.

Moreover, multiple prior art references confirm that it was the practice to use vents connected to the fluid processing system in the semiconductor manufacturing area. Ex. 6, Geibel Decl.,¶ 11, citing Exs. 6G and 6H; Ex. 5, Paul Decl., ¶ 61, citing Ex. F. The Patent Office did have before it several prior art references, such as Bowers (Ex. 5F) and Waferguard (Ex. 6H), that taught vent connectors as part of the requirements for the semiconductor manufacturing industry. There is nothing in the record to indicate that the Patent Office appreciated the pertinence of these references.

Similarly, the requirement that the quick-connect arrangement connect three connectors simultaneously is also inconsequential. The specification of the '667 patent admits that prior art devices typically contain three or more connectors—"Disposable modules usually require that multiple connections be made sequentially, a minimum of two connectors, and more typically three or four." Ex. 1, '667 patent, col. 2, ll. 15-18. Mr. Geibel states that determining the number of connectors on a fluid separation module is a routine design choice faced by all filter designers. Ex. 6, Geibel Decl., ¶ 2.

Further, the prior art shows that three or more quick-connect connectors on one end of a fluid separation module is nothing unique. As shown in prior art U.S. Patent Nos. 5,601,710 to Yoon ("Yoon," Ex. 5N), 5,133,858 to Walz et al. ("Walz," Ex. 5O), and Re. 34,050 to Thomsen ("Thomsen," Ex. 5L), respectively represented below, quick-connect manifolds for three or more filter housing connectors were well-known prior to Entegris' purported invention:



Ex. 5N, Yoon, Figs. 3 and 4; Ex. 5O, Walz, Fig. 2; Ex. 5L, Thomsen, Fig. 1, 2 and 4-6. *See also*

Ex. 5, Paul Decl., ¶¶ 48 and 49, referencing prior art U.S. Patent Nos. 5,507,530 ("Mahaney,"

Ex. 5Q) and 5,316,347 ("Arosio," Ex. 5P), as four-connector quick-connect manifolds. In

addition to having three connectors, each of Yoon, Walz and Thomsen includes a connector that

functions as a gas vent. Ex. 5, Paul Decl., ¶¶ 40, 43 and 33; Ex. 6, Geibel Decl., ¶¶ 5 and 6.

While Yoon and Walz are listed among the 230 references cited, the Patent Office never

mentioned either prior art patent during the prosecution of the '667 patent;[1] and Thomsen was

not among the cited references.

---

[1]  The same examiner did cite the Yoon reference in connection with yet another Entegris application that was pending at the time. In response, Entegris' counsel suggested that it would be "difficult to use one of the connectors 110a, b, c as a vent." Ex. 12, November 21, 2005 Amendment at p. 14. Contrary to this representation, Professor Paul and Mr. Geibel both confirm that a connector in Yoon will function as a gas vent. Ex. 5, Paul Decl., ¶ 40; Ex. 6, Geibel Decl., ¶ 6.

**E.     The Jenkins Reference, Cited as Anticipatory by the Patent Office but Withdrawn for Failure to Qualify as Prior Art under Section 102(e), Does Qualify as a Prior Invention under Section 102(g)**

In an Office Action dated June 8, 2005, the Patent Office cited U.S. Patent No. 6,048,454 ("Jenkins," Ex. 5M) as anticipatory of application claim 28, which became claim 1 of the '667 patent. Ex. 10, June 8, 2005 Office Action. Entegris did not dispute that Jenkins would be anticipatory of claim 28 if prior art thereto. *Id.*, Response to Office Action. Instead, Entegris persuaded the Patent Office to withdraw the rejection based upon the fact that Jenkins did not file for a patent application until after the July 12, 1996 filing date to which Entegris claims priority. *Id.* While that disqualifies Jenkins under 35 U.S.C. § 102(e), it leaves open the issue of whether Jenkins qualifies as prior art under other provisions of Section 102, such as Section 102(g). Under Section 102(g), if it is shown that Jenkins developed his invention before Entegris developed its invention, then the former is prior art to the latter. *See* Section IV.b.2, below.



Pall investigated the matter and found that Mr. Jenkins conceived of his invention by 1994 and reduced it to practice by mid-1995. Ex. 8, Jenkins Decl., ¶ 4-5. Prototypes, witnessed documents and his patent attorney corroborate Mr. Jenkins' activities fully. Ex. 9, Zugelter Decl., ¶¶ 4-6. By contrast, and by its own admission, Entegris did not start working on its development until some unspecified time in 1995 to early 1996. *See* Entegris Mem., p. 3. Based upon these dates, Jenkins qualifies as prior art to the '667 patent.

As indicated in Figure 2 of the Jenkins patent (reproduced on the left), the three connectors on the

12

filter module quick-connect with a manifold having three connectors, one of the connectors being a gas vent. Ex. 8A, Jenkins, Fig. 1; Ex. 5, Paul Decl., ¶ 36. Once the Jenkins development is recognized as prior art based upon prior invention—facts to which the Patent Office had no access—it is anticipatory of claim 1 of the '667 patent.

### F. Entegris Secured Claim 24 Ostensibly Covering the Internal Structures of Pall's EZD-3 Filter Capsules through a Misrepresentation to the Patent Office

After the Court dissolved the injunction in January 2005, Entegris amended the pending '667 patent claims to call for three connectors on top of the filter module. At the same time, presumably as a hedge in case the Patent Office would reject its broad independent claims relying on three connectors as the inventive feature, Entegris introduced a new dependent claim 56 (which ultimately became patent claim 24) that called for highly-specific internal structures of the filter capsule. Ex. 10, April 8, 2005 Amendment. Among many other features, the claim calls for an internal conduit extending from the inlet connector to the bottom of the internal housing of the filter capsule. Claim 24 does not specify whether the conduit is centrally or non-centrally located, and therefore ostensibly covers a non-central conduit. For reasons discussed below, this subtlety is clearly the reason Entegris wanted the superficially narrow claim 24.

For purposes of patentability, Entegris represented to the Patent Office that nothing in the amendment adding claim 56, including the non-central conduit claim limitation, extended beyond the scope of the specification of the '667 patent—"No new matter is added." Ex. 10, April 8, 2005 Amendment. Contrary to Entegris' representation, however, the specification of the '667 patent is completely devoid of any disclosure regarding the internal structure of the claimed filter capsule. Specifically, the '667 patent specification does not disclose a conduit extending from the inlet connector to the bottom of the filter capsule. The '667 patent certainly does not disclose or suggest a non-central conduit. Nor does anything incorporated by reference into the specification support a non-central conduit limitation. For example, U.S. Patent No.

5,762,789 ("the '789 patent"), which the '667 patent purports to incorporate by reference,[2]

discloses and claims only a central conduit—it does not teach or suggest a non-central conduit.

Thus, it was a misrepresentation for Entegris to assert matter-of-factly that the non-central

conduit limitation of claim 24 added "no new matter."

The motivation behind Entegris' misrepresentation is clear once one appreciates the

context in which it arose.  Claim 24 of the '667 patent marks the first and only claim Entegris has

ever pressed through the Patent Office that arguably covers specific internal features of Pall's

filter capsules.  The '789 patent cannot reach Pall's filter capsules having a <u>non-central</u> conduit

inasmuch as the '789 patent issued in 1998 and the time has long passed for the filing of a

broadening reissue.[3]  Yet, Entegris effectively obtained a broadening reissue seven years later by

way of claim 24 of the '667 patent.  In order to read on the specific internal features of Pall's

filter capsules, Entegris added claim 24 of the '667 patent ostensibly covering a non-central

conduit.  Entegris could only get away with adding claim 24 by misrepresenting to the Patent

Office that the specification supported such a claim covering a non-central conduit—which it

clearly does not.

Given that Entegris has now spent years obtaining and attempting to enforce its patents

against Pall, Entegris undoubtedly was acutely aware of the limitations of its '789 patent.

Entegris and its patent counsel—the same firm that represents Entegris in this and the 2003

action—must be presumed to have known exactly what they were doing in misrepresenting to

the Patent Office that the '667 patent specification supported the non-central conduit of claim 24.

At this point, the facts point to the conclusion that Entegris undertook to mislead the Patent

---

[2]   As discussed below, as a matter of law, Entegris did not properly incorporate the entirety of the '789 patent into the '667 patent.

[3] The deadline for filing a broadened reissue is two years from the date of issuance of a patent.  Here the '789 patent issued on June 9, 1998, such that the deadline for filing a broadening reissue was June 9, 2000, almost three years before Entegris commenced the 2003 action.

Office into issuing unsupported claims that it could then assert against Pall in an effort to disrupt Pall's business and to monopolize the filter capsule market in the microelectronics industry.

Discovery, once it is finally open,[4] should shed additional light on Entegris' conduct before the Patent Office in securing the allowance of claim 24 of the '667 patent.

## IV.    ARGUMENT

Entegris acknowledges that it bears the burden of proving:  (1) that Entegris is likely to succeed on the merits of its claim at trial; (2) that Entegris would suffer irreparable harm absent a preliminary injunction; (3) that the balance of hardships favors a preliminary injunction; and (4) that a preliminary injunction would be in the public interest.  *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997){ TA \l "*Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361 (Fed. Cir. 1997)" \s "Genentech" \c 1 }; *Texas Instruments Inc. v. Tessera, Inc.*, 231 F.3d 1325, 1329 (Fed. Cir. 2000){ TA \l "*Texas Instruments Inc. v. Tessera, Inc.*, 231 F.3d 1325 (Fed. Cir. 2000)" \s "Texas Instruments" \c 1 }.  Entegris fails to make an adequate showing as to any factor.

### A.    A Preliminary Injunction would Severely Disrupt the Market

As a threshold matter, the requested preemptive injunction would severely adversely affect the present two-supplier market.  Given that Pall and Entegris are the only suppliers of the filtration products at issue, an injunction would create a new market condition where Entegris would hold a monopoly.  Entegris' request for a preliminary injunction is thus at odds with the principles underlying the extraordinary relief—*i.e.*, to preserve the market pending a full trial on the merits:

> It is so well settled as not to require citation of authority that the usual function of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits.  The hearing is not to be transformed into a trial of the merits of the action upon affidavits, and it is not usually proper to grant the moving party the full relief to which he

---

[4] But for some limited preliminary discovery in advance of the August 2003 preliminary injunction hearing in the 2003 action, Pall has not yet been afforded discovery from Entegris.

might be entitled if successful at the conclusion of trial. This is particularly true where the relief afforded, rather than preserving the status quo, completely changes it.

*Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808-09 (9th Cir. 1963{ TA \l "*Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804 (9th Cir. 1963)" \s "Tanner" \c 1 }).

Since mid-2004, Pall has sold its EZD-3 filter assemblies without complaint by Entegris. Entegris remained completely silent about its intent to seek an injunction against Pall's EZD-3 filter assemblies until April 2006 when the '667 patent issued. Therefore, the requested injunction could not possibly preserve the two-year-old market conditions that existed prior to the issuance of the '667 patent. *See*, *e.g.*, *Archive Corp. v. Cipher Data Prod. Inc.*, 12 U.S.P.Q.2d 1464, 1468 (C.D. Cal. 1988){ TA \l "*Archive Corp. v. Cipher Data Prod. Inc.*, 12 U.S.P.Q.2d 1464 (C.D. Cal. 1988)" \s "Archive" \c 1 } ("Because Archive has been manufacturing the accused tape drives long prior to the issuance of either patent [between two and three years], the injunction could not preserve the status quo and would conversely create new market conditions.").

Because the requested injunction would alter rather than maintain the market status quo, the Court should require Entegris to make "a clear showing" that it is likely to overcome Pall's defenses at trial and that it will suffer "extreme or very serious damage" if a preliminary injunction is denied. *See*, *e.g.*, *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995){ TA \l "*Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27 (2d Cir. 1995)" \s "Tom Doherty" \c 1 }; *Deleo v. Zconnexx Corp.*, No. 00-CV-0319E(F), 2000 WL 1610668, at *4 (W.D.N.Y. Oct. 25, 2000){ TA \l "*Deleo v. Zconnexx Corp.*, No. 00-CV-0319E(F), 2000 WL 1610668 (W.D.N.Y. Oct. 25, 2000)" \s "Deleo" \c 1 }; *Gov't Ctr. Camera, Inc. v. U.S.*, No. 87-2208-S, 1987 WL 28337, at *1 (D. Mass. Nov. 5, 1987){ TA \l "*Gov't Ctr. Camera, Inc. v. U.S.*, No. 87-2208-S, 1987 WL 28337 (D. Mass. Nov. 5, 1987)" \s "Gov't Ctr." \c 1 }. Entegris cannot

make a clear showing on the merits because the '667 patent is invalid and unenforceable. Further, one can hardly consider that denying Entegris a monopoly could constitute "extreme damage" to the multi-billion dollar corporation.

The Court should preserve the current market conditions and deny Entegris' request for a preliminary injunction.

**B.    Entegris will Not Likely Succeed on the Merits Because the Asserted Claims of the '667 Patent are Invalid in View of the Prior Art**

The Entegris '667 patent shares the same specification with the '907 patent at issue in the 2003 action, the claims of which the Court held likely anticipated by the prior art. Despite Entegris' argument and the Court finding that the key aspect of the invention described in the specification was "automatic" alignment, and the Court holding that automatic alignment was the only thing that distinguished the '770 and '907 claims from Ogden, Entegris abandoned that limitation in its '667 patent because Pall's devices do not employ automatic alignment. Entegris replaced the key automatic alignment feature with inconsequential limitations such as "three connectors" and "a gas vent." Those well-known features cannot support patentability, however, and the claims of the '667 patent are invalid.

**1.    Claim Construction of the Independent Claims**

Claims 1, 2, 14 and 25 are the independent claims of the '667 patent. As is evident from the language of the claims, each requires "at least three connectors" and "a gas vent." Claims 1, 14 and 25 call for a "pump" and claims 2, 14 and 25 call for a "receptor." None of the independent claims call for automatic alignment. As reflected in the table attached as Exhibit R to Professor Paul's declaration, the claims share a considerable amount of common language. Claim 1 is the broadest claim and is set forth below:

> A dispense pump and manifold assembly for a disposable fluid separation module having at least three connectors on a top end of the module, comprising:
>
> a dispense pump; and

a quick-connect manifold piped to the dispense pump, the quick connect manifold arranged to provide simultaneous connection and sealing of the at least three connectors on the top end of the fluid separation module, wherein at least one of the three connectors is a gas vent.

Claim 2 has most of the language found in claims 14 and 25 and is set forth below:

A quick-connect manifold assembly for a disposable fluid separation module, comprising:

a fluid connector member comprising a first set of at least three connectors extending through the fluid connector member, the connector being spaced apart and parallel to one another; and

a module receptor configured with the fluid connector member so as to provide the module receptor a limited range of a first movement relative to the fluid connector member, the module receptor receiving a disposable fluid separation module having a second set of connectors, the first set of connectors capable of being substantially simultaneously engaged to, or disengaged from, the second set of connectors on the disposable fluid separation module by the first movement of the module receptor;

wherein at least one connector of the first set of connectors is for introducing liquids to the disposable fluid separation module, at least one connector of the first set of connectors is for withdrawing liquids from the disposable fluid separation module, and at least one connector of the first set of connectors is a gas vent from the disposable fluid separation module.

Claim 14 is substantially identical to claim 2 except that it also requires a pump in fluid communication with the fluid connectors, *i.e.*:

… at least one connector being in fluid communication with the fluid inlet or the fluid outlet of the pump apparatus ….

Claim 25 is substantially identical to claim 14 except that it requires a locking mechanism, *i.e.*:

… a locking mechanism that locks the receptor to the fluid connector member by a movement in a direction substantially perpendicular to the direction of the first movement required for engagement of the first set of connectors to the second set of connectors on the fluid separation module ….

According to Professor Paul, a person of ordinary skill in the art would interpret the independent claims 1, 2, 14 and 25 as encompassing a manifold assembly for quick connection and disconnection of a fluid separation module having at least three connectors. At least one

connector on the fluid connector member introduces liquids into the separation module, and at least one connector withdraws liquids from the separation module. At least one of the three connectors is a gas vent. Ex. 5, Paul Decl., ¶ 51.

The claims of the '667 patent require three or more connectors that are spaced apart and parallel to each other. *Id*. at ¶ 54. Some of these connectors may have the same function, *e.g.*, two outlet connectors, by virtue of the "at least one" claim language. *Id*. at ¶ 54. Conversely, a single connector may have multiple functions, *e.g.*, a fluid outlet and a gas vent. *Id*. at ¶ 54. This construction is consistent with the specification, which describes that the connectors non-exclusively "comprise" an inlet, outlet or vent:

> One of the connectors 21 *comprises* a fluid inlet to the housing 23. A second connector 21 *comprises* a fluid outlet from the housing 23. A third connector 21 *comprises* a vent for removing gas from the housing 23.

Ex. 1, col. 5, ll. 3-6 (emphasis added). This claim construction is relevant to the prior art Yoon patent, for example, that vents through a fluid outlet connector. Ex. 5, Paul Decl., ¶ 40; Ex. 6, Geibel Decl., ¶ 5.

One characteristic of the claimed fluid separation modules is that the modules are "disposable" (at least in claims 2, 14 and 25), meaning that "the whole module is removed and disposed of whenever the separation element requires replacement." Ex. 1, '667 patent, col. 2, ll. 1-15. During prosecution, neither the Patent Office nor Entegris relied on the "disposable" requirement as a patentable feature. In the context of the '667 patent, the configuration and number of connectors on the module are the significant considerations, not whether, once the filter module is removed from the manifold, some part of the module is reused. As a practical matter, all fluid modules are disposable at some point. Accordingly, in the context of the '667 patent, the term "disposable" does not breathe any consequential life or meaning into the claims, but rather is a statement of the intended manner of use of the fluid separation module.

Similarly, the specification of a fluid pump in claims 1, 14 and 25 also does not breathe any consequential life or meaning into the claims.  In every common type of fluid separation module, fluid moves through the separation element under pressure.  Ex. 5, Paul Decl., ¶ 22. Fluid pumps dispense the fluids and create the necessary pressure for filtration through the separation element.  Ex. 5, Paul Decl., ¶ 41.  Stating that a filter capsule has a connection to a pump is like stating that an airplane has wings—it is understood.

## 2.     Independent Claim 1 is Anticipated by the Prior Art

A reference that meets every element of the claim is said to "anticipate" the claim under 35 U.S.C. § 102{ TA \l "35 U.S.C. § 102" \s "35 U.S.C. § 102" \c 2 }.  Pall's technical expert, Professor Paul, who taught mechanical engineering at MIT for nearly 40 years, concludes that each and every element of claim 1 is found in each of several prior art patents.  Ex. 5, Paul Decl., ¶¶ 57-58, citing the detailed claim charts and summary chart appended to his declaration as Exhibits R-W.  Specifically, Professor Paul concludes that each of Yoon, Walz, Thomsen, Bowers and Jenkins discloses every element of claim 1.  *Id*.  Each of these prior art patents discloses a quick-connect manifold for a fluid separation module having three connectors on the top end, wherein one of those connections is a gas vent.  *Id*.

The Patent Office failed to appreciate Yoon, Walz and Bowers as pertinent references, and the prior art Thomsen patent was not before the Patent Office.  The Patent Office did reject claim 1 (then application claim 28) as anticipated by Jenkins.  Ex. 10, June 8, 2005 Office Action.  Entegris did not dispute that Jenkins anticipated claim 1, but rather convinced the Patent Office that the Jenkins patent was not prior art due to its 1997 filing date.  Ex. 10, June 24, 2005 Amendment.  Unbeknownst to the Patent Office, but as established by Mr. Jenkins in his declaration submitted herewith (Ex. 8), Mr. Jenkins' activities prior to 1997 are prior art to the Entegris '667 patent under at least 35 U.S.C. § 102(g){ TA \l "35 U.S.C. § 102(g)" \s "35 U.S.C. § 102(g)" \c 2 }.

{ TA \l "35 U.S.C. § 102(g)(2)" \s "35 U.S.C. § 102(g)(2)" \c 2 }Section 102(g)(2) states that "a person shall be entitled to a patent unless ... before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it."  35 U.S.C. § 102(g)(2){ TA \s "35 U.S.C. § 102(g)(2)" }.  According to Entegris, its predecessor developed the claimed subject matter of the '667 patent by "1995 or early 1996." *See* Entegris Mem., p. 3.  By contrast, Mr. Jenkins began working on his invention in the early 1990s.  By mid-1994, Mr. Jenkins had conceived of, and by mid-1995, had reduced to practice, the embodiment having every feature described in claim 1 of the '667 patent.  Ex. 8, Jenkins Decl., ¶¶ 4-11; Ex. 9, Zugelter Decl., ¶¶ 4-6.  Accordingly, Mr. Jenkins both conceived of and reduced to practice the subject matter of claim 1 before Entegris' predecessor, and his activities are therefore anticipatory prior art under Section 102(g){ TA \s "35 U.S.C. § 102(g)" }.  *See, e.g., New Idea Farm Equip. Corp. v. Sperry Corp.*, 916 F.2d 1561, 1566-67 (Fed. Cir. 1990){ TA \l "*New Idea Farm Equip. Corp. v. Sperry Corp.*, 916 F.2d 1561 (Fed. Cir. 1990)" \s "New Idea" \c 1 } (affirming invalidity under Section 102(g) because "[i]t is well established that, in a priority contest, the party first to conceive and first to reduce to practice prevails.").

### 3.    Independent Claims 2, 14 and 25 are Obvious in View of the Prior Art

The anticipation of claim 1 logically calls into question the validity of the other independent claims, which add merely a receptor limitation to claim 1.  But for the number of connectors, each and every element of independent claims 2, 14 and 25 of the '667 patent is found in the Figure 3 embodiment of Ogden.  Ex. 5, Paul Decl., ¶¶ 59-66, citing the detailed claim charts and summary chart appended to his declaration as Exhibits 5R-5Y.  Claims 2, 14 and 25 of the '667 patent call for "at least three connectors," while the prior art Ogden patent discloses two connectors.  Ex. 5, Paul Decl., ¶ 63.  The difference between the numbers of

connectors in the context of quick-connect manifolds, however, was not a patentable distinction. *Id*. at ¶¶ 64-66.

A patent may be found invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103{ TA \l "35 U.S.C. § 103" \s "35 U.S.C. § 103" \c 2 }. The ultimate question of obviousness is one of law based upon four underlying factual inquiries: (a) the level of ordinary skill in the pertinent art, (b) the scope and content of the prior art, (c) the differences between the prior art and the claims at issue and (d) secondary considerations of nonobviousness. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18, 86 S. Ct. 684, 694 (1966){ TA \l "*Graham v. John Deere Co. of Kansas City*,

383 U.S. 1, 86 S. Ct. 684 (1966)" \s "Graham" \c 1 }; *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1354 (Fed. Cir. 2001){ TA \l "*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*,

264 F.3d 1344 (Fed. Cir. 2001)" \s "Sandt" \c 1 }.

As demonstrated by the *Graham*{ TA \s "Graham" *}* analysis set forth below, independent claims 2, 14 and 25 are invalid as obvious in view of Ogden alone or in combination with other prior art, such as Bowers.

### a.    The Level of Ordinary Skill in the Art

Professor Paul continues to opine that the appropriate level of ordinary skill for a development pertaining to the quick-connect manifolds at issue in this matter would be a person having at least a bachelor's degree in mechanical engineering with at least a few years experience in the filtration and fluid processing area. Ex. 5, Paul Decl., ¶ 8.

### b.    The Scope and Content of the Prior Art

A prior art reference is relevant to assessing the validity of the '667 patent claims if it is from the same field of endeavor (*i.e.*, the quick-connection of fluid processing modules to fluid

systems) or if it is reasonably pertinent to the particular problem to be solved (*i.e.*, 3-connector quick-connect manifolds). *In re Paulsen*, 30 F.3d 1475, 1481 (Fed. Cir. 1994){ TA \l "*In re Paulsen*,

30 F.3d 1475 (Fed. Cir. 1994)" \s "In re Paulsen" \c 1 }; *In re Deminski*, 796 F.2d 436, 442 (Fed. Cir. 1986){ TA \l "*In re Deminski*,

796 F.2d 436 (Fed. Cir. 1986)" \s "In re Deminski" \c 1 }. The hypothetical person of ordinary skill in the art presumptively knows and understands the pertinence of relevant prior art. *In re Gorman*, 933 F.2d 982, 986 (Fed. Cir. 1991){ TA \l "*In re Gorman*,

933 F.2d 982 (Fed. Cir. 1991)" \s "In re Gorman" \c 1 }.

There can be no real dispute that Ogden and the other prior art references identified by Pall are relevant. Ogden and the other references disclose quick-connect manifolds and fluid separation modules having multiple connectors on the same end of the housing, where one of those connectors is a vent. Ex. 5, Paul Decl., ¶¶ 19, 27, 33, 37, 40 and 43. Bowers is directed specifically to fluid separation systems in the microelectronics fabrication industry and confirms that it is the practice in the microelectronics industry to employ three connectors—an inlet, an outlet and a vent. *Id.* at ¶ 16. With respect to Sumitomo, the Court has held that:

> [A]n inventor seeking to create a fluid separation system for the semiconductor fabrication industry that utilizes a disposable separation module with quick-connect capability may well have been motivated to consider the Sumitomo references alone or in combination with fluid filtration devices like the Ogden patent (U.S. Patent No. 3,727,764).

*See* 2003 Docket No. 106, Memorandum and Order, p. 11.

Each of independent claims 2, 14 and 25 is within a hairsbreadth of anticipation in view of Ogden and the other prior art. The quick-connect devices of Ogden and the other prior art logically would have commended themselves to the attention of an ordinarily skilled artisan in considering the problem of 3-connector quick-connect devices for fluid separation modules as claimed in the '667 patent. Ogden and the other prior publications are prior art for purposes of

determining the obviousness of the Entegris '667 patent. *Paulsen*, 30 F.3d at 1481-82{ TA \s "In re Paulsen" }.

**c.      The Difference between the Prior Art Ogden Patent and Independent Claims 2, 14 and 25 is Insubstantial**

The question of invalidity under 35 U.S.C. § 103{ TA \s "35 U.S.C. § 103" } is whether the structure would have been obvious to one of ordinary skill in the art attempting to solve the problem upon which the inventor was working. *Para-Ordinance Mfg., Inc. v. SGS Imp. Int'l, Inc.*, 73 F.3d 1085, 1088 (Fed. Cir. 1995){ TA \l "*Para-Ordinance Mfg., Inc. v. SGS Imp. Int'l, Inc.*, 73 F.3d 1085 (Fed. Cir. 1995)" \s "Para-Ordinance" \c 1 }.  Claims 2, 14 and 25 of the '667 patent call for "at least three connectors," while the prior art Ogden patent discloses two connectors.  Accordingly, the question of obviousness in view of Ogden is reduced to the following inquiry:

> (1) whether a person of ordinary skill in the art would have been motivated to adopt the two-connector manifold of Ogden for an assembly requiring a third connector; and

> (2) whether a person of ordinary skill in the art would have had a reasonable expectation of successfully adopting the two-connector manifold of Ogden for an assembly requiring a third connector.

*See*, *e.g.*, *In re Vaeck*, 947 F.2d 488, 493 (Fed. Cir. 1991){ TA \l "*In re Vaeck*, 947 F.2d 488 (Fed. Cir. 1991)" \s "In re Vaeck" \c 1 }.

The number of fluid connectors, particularly two connectors versus three connectors, was a routine engineering problem faced by all filter manufacturers well before the mid-1990s.  Ex. 6, Geibel Decl., ¶¶ 2-3.  Ogden happens to have two connectors—an outlet connector and an inlet/vent connector.  Ex. 5, Paul Decl., ¶ 19.  The combination of the inlet and vent connector in Ogden into a single connector evidences that a person of ordinary skill in the art would have understood that the number of connectors was nothing more than mere design choice.  *Id*. at ¶ 63.

Indeed, Ogden does not even mention the vent feature in describing the quick-connect filter assembly. *Id.*

The specification of the '667 patent also evidences that a selection of the number of connectors was nothing more than routine design choice in the mid-1990s. According to the '667 patent specification, prior art filter assemblies typically had between two and four connectors:

> Disposable modules generally require that multiple connections be made sequentially, a minimum of two connections, and more typically three or four.

Ex. 1, col. 2, ll. 15-18 (emphasis added). The claims of the '770 patent simply call for a "plurality" of connectors and claim 1 of the '907 patent calls for two connectors—an inlet connector and an outlet connector. All of the claims are silent as to any vent. Ex. 2, '770 patent, claim 1; Ex. 3, '907 patent, claim 1. This belies Entegris' current focus on an inlet, an outlet and a vent as an inventive combination. From the perspective of a person of ordinary skill in the art in 1995 or early 1996, there was no meaningful distinction between the quick-connection of two connectors versus the quick-connection of three connectors. Ex. 5, Paul Decl., ¶ 64.

In addition, there was nothing inventive about providing a separate gas vent connector. For example, the specification of the '667 patent itself emphasizes the optional nature of vents by stating that one can simply disable the gas vent connector and render it functionless:

> When venting of gas is not a requirement, a valve or the like in a conduit in fluid communication with the vent connector can be utilized to close fluid flow through the vent connector.

Ex. 1, col. 5, ll. 6-9. From the perspective of a person of ordinary skill in the art in 1995 or early 1996, there was no inventive input required to accommodate either quick-connect filter assemblies like Ogden that vented through the inlet or outlet connectors or those like Jenkins that vented through a separate vent connector. Ex. 5, Paul Decl., ¶¶ 65 and 67.

Jenkins provides specific motivation to provide separate inlet and vent connectors in the practice of Ogden if faced with an application calling for three connectors. Even assuming the problem faced by Entegris was somehow unique to the microelectronics manufacturing industry, the prior art Bowers patent (which discloses an earlier generation of Entegris' integral pump and filtration system that is illustrated in Figure 1 of the '667 patent) describes three connectors, with one of those connectors being a gas vent. Ex. 5F, Fig. 1 and col. 7, ll. 9-13. Like Jenkins, Bowers would have provided explicit motivation to a person of ordinary skill in the art to provide separate inlet and vent connectors in the practice of Ogden if faced with the 3-connector specification of the microelectronics manufacturing industry since as early as the 1980s. Ex. 6, Geibel Decl., ¶ 11; Ex. 5, Paul Decl., ¶¶ 61 and 66; both citing Waferguard (Ex. 6H) and Tritec (Ex. 6G) references. In view of the routine design considerations and the multitude of multiple connector quick-connect assemblies of the prior art, a person of ordinary skill in the art would have had a reasonable expectation of success (indeed, a virtual certainty) and would have had to apply no inventive skill in adopting the two-connector manifold of Ogden for an assembly requiring a third connector. *Id*. at ¶¶ 62 and 67.

Entegris' prior criticism that the receptor in Ogden would cause contents to spill is a red herring. None of the claims at issue contains limitations directed to spillage. Even if one considered spillage as a potential issue with the Figure 3 embodiment of Ogden, a person of ordinary skill in the art would have readily resolved any problem by employing caps or by adopting a linear, vertical receptor like Sumitomo. Ex. 5, Paul Decl., ¶ 68; Ex. 6, Geibel Decl., ¶ 10.

### d.    No Secondary Considerations of Nonobviousness Exist

Neither commercial success nor any other so-called objective indicia of nonobviousness can overcome the strong showing of obviousness. *Newell Co., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 769 (Fed. Cir. 1988){ TA \l "*Newell Co., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757 (Fed. Cir. 1988)" \s "Newell" \c 1 }. Beyond naked assertions by its counsel (*see*

Entegris Mem., p.16) and one of its affiants (*see* King Affidavit, ¶ 13), Entegris has presented no data whatever to support its claim that its newly-defined "invention" calling for three connectors and a vent has achieved any commercial success. Having chosen not to submit any evidence, the Court should disregard Entegris' self-serving assertions and assess the obviousness analysis on the technical merits without regard to any so-called secondary considerations.

Previously, Entegris argued that its products enjoyed significant commercial success due to the key automatic alignment feature. Even if true, which Pall disputes it is, any such commercial success would be irrelevant to the claims of the '667 patent. Rather, the reality is that the two-supplier market comprises Entegris and Pall, and both of their products employ quick-connect systems. Hence, the customers are merely buying the products offered. Moreover, Entegris bundles its quick-connect systems with its pumps. There is no reason to believe that the nature of those quick-connect systems, rather than the filters themselves or Entegris' pumps, are the reason behind any sales of the bundled products.

The absence of secondary considerations of nonobviousness confirm that independent claims 2, 14 and 25 are obvious in view of the prior art.

> **e.      The Recent Revocation of Nearly Identical Claims by the European Patent Office is Further Evidence of the Likely Invalidity of the '667 Patent Claims**

The conclusion that claims 2, 14 and 25 are invalid as obvious is confirmed by the matter-of-fact manner in which the Opposition Division of the European Patent Office recently held that Entegris' three-connector claims (and all other claims proposed by Entegris that were not held to be anticipated) were unpatentable for lack of "inventive step"—the European Patent Office's equivalent to "obviousness":

The only feature of claim 1 not disclosed in [U.S. Patent No. 5,022,986 ("Lang") attached hereto as Ex. 11[5]] are the three connectors mentioned above (see item 6.1). To add a third connector, however, is a straightforward measure, as pointed out by [Pall], in order to adapt the filter assembly of [Lang] to the requirements of a different fluid processing device.

...

Should the fluid processing system require a third connector, e.g., for venting like in [Bowers, attached as Ex. 5F], the third connector would necessarily be positioned next to and similar to the other two quick-connect-fashion connectors.

Ex. 4, May 2, 2006 Decision of European Patent Office Revoking Entegris' European Patent EP-B-818228, pp. 14-15.

### 4. The Remaining Dependent Claims are Also Invalid

Exhibit X of Professor Paul's declaration sets forth an element-by-element correlation between the language of dependent claims 3, 5-13, 15-22, 24 and 26-29 of the '667 patent and the Figure 3 embodiment of Ogden. The dependent claims add inconsequential limitations to the independent claims. Accordingly, for the same reasons stated above with respect to independent claims 2, 14 and 25, and for the additional reasons set forth below, claims 3, 5-13, 15-22, 24 and 26-29 were obvious to a person having ordinary skill in the art in the mid-1990s.

### a. Claim 10

Claim 10 requires that "the first set of connectors extend in a substantially vertical direction from a first surface of the fluid connector member." In Ogden, the first set of connectors extends in a vertical direction from the top surface of the fluid connector member. Ex. 5H, Fig. 3. Accordingly, claim 10 would have been obvious in view of Ogden. Ex. 5, Paul Decl., ¶ 78.

---

[5] Because of some differences between Entegris' European claims and those of the '667 patent, the European Patent Office considered the Lang patent—cited by Pall in the 2003 action—to be the most pertinent starting point for the European three connector claims. Pall asserts that Ogden is the most pertinent starting point with respect to claims 2, 14 and 25 of the U.S. '667 patent. The European Patent Office revoked other Entegris claims as anticipated by Ogden. *See* Ex. 4, pp. 5-7 (where Ogden is cited as reference "D3").

### b.    Claim 11

Like independent claim 14, claim 11 adds to independent claim 2 a fluid pump.  Claim 11 therefore would have been obvious for the same reasons stated above with respect to claim 14. Ex. 5, Paul Decl., ¶ 70.

### c.    Claims 3, 13, 22 and 27

Claim 3 requires that "the module receptor is attached to the fluid connector member." Claims 13, 22 and 27 require that "the first movement of the module receptor is a substantially vertical movement."  In Ogden, a hinge attaches the module receptor to the fluid connector member and the first movement of the module receptor about the hinge is a substantially vertical movement.  Claims 3, 13, 22 and 27 therefore would also have been obvious in view of Ogden. Ex. 5, Paul Decl., ¶ 71.

### d.    Claims 5-8, 26, 28 and 29

Claims 5, 7 and 26 require "a locking [unlocking] mechanism that locks [unlocks] the receptor to the fluid connector member by a movement in a direction substantially perpendicular to the direction of motion of the first movement."  Claims 8 and 28 recite, "the locking mechanism locks the receptor to the fluid connector member by a movement in a substantially horizontal direction."  In Ogden, the latch locks the receptor to the fluid connector member by a movement in a direction substantially perpendicular (*i.e.*, horizontal) to the direction of motion of the first movement (*i.e.*, vertical).  Claims 5, 7, 8, 26 and 28 therefore would also have been obvious in view of Ogden.  Ex. 5, Paul Decl., ¶ 72.

Claims 6 and 29 recite, "the locking mechanism is spring-loaded."  In Ogden, the locking mechanism is not spring-loaded.  However, this is nothing more than a routine design choice. For example, the locking mechanism described in Jenkins is spring-loaded.  Claims 6 and 29 therefore would also have been obvious in view of Ogden alone or in combination with Jenkins. Ex. 5, Paul Decl., ¶ 73.

e.        **Claims 9 and 21**

Claim 21 requires that "the receptor is adapted to support the disposable fluid separation module in alignment with the fluid connector member."  In Ogden, the receptor supports the disposable fluid separation module in alignment with the fluid connector member after the user inserts and aligns the module in the receptor:

> In installing the filter cartridge … [t]he filter cartridge 25 is then inserted within the upper portion of the cavity formed by the manifold 11 and *aligned* to position the extensions 37 and 38 into the inlet and outlet conduits 21 and 23 respectively.  … After the housing members 11 and 13 are secured, the apparatus is in its operable position.

Ex. 5H, col. 3, ll. 3-15 (emphasis added).

Claim 9 is the only claim of the '667 patent that explicitly requires automatic alignment:

> The quick-connect manifold of claim  2, wherein the receptor is adapted to support the disposable fluid separation module in alignment with the fluid connector member, the receptor comprising at least one slot that is configured to mate with a corresponding protrusion on the fluid separation module to facilitate alignment of the fluid separation module with the fluid connector member.

Ex. 1.  Ogden does not expressly disclose a slot configured to mate with a protrusion on the fluid separation module to facilitate alignment.  In Sumitomo, however, the receptors include slots that mate with the corresponding flanges on the fluid module to facilitate alignment.  Ex. 5I, Fig. 1; Ex. 5J, Figs. 1 and 2; and Ex. 5K (animation of Sumitomo).  In Yoon, the receptor includes a slot that mates with the corresponding protrusion on the fluid separation module to facilitate alignment.  Ex. 5N, Fig. 9.  A person of ordinary skill in the art would have had a reasonable expectation of success in adopting the "automatic" alignment features of Sumitomo and Yoon in the practice of Ogden.  Ex. 5, Paul Decl., ¶ 75.

Accordingly, claims 9 and 21 would have been obvious in view of Ogden alone or in combination with Sumitomo or Yoon.  *Id.*

**f.    Claims 12 and 15-20**

Claims 12 and 15-20 recite the design features described in the Bowers patent.  Claim 12 requires that "the pump is close-coupled to the fluid connector member to minimize extraneous fluid connections."  Claim 15 requires that "the quick-connect manifold is mounted underneath the pump apparatus."  Claim 16 requires that "the pump apparatus and the manifold have width dimensions, and the width of the manifold does not exceed the width of the pump."  Claim 17 requires that "the system is part of a fluid dispensing apparatus."  Claim 18 requires that "the pump apparatus comprises a dispense pump for dispensing process fluids onto a semiconductor wafer."  Claim 19 requires that "the pump apparatus comprises a feed pump for pumping fluid through the separation module."  Claim 20 requires that "the pump apparatus comprises a dispense pump and a feed pump."

A person of ordinary skill in the art would understand the claim requirements of claims 12 and 15-20 as well-known and routine design choices.  Moreover, the '667 specification describes these claim requirements as "typical" in the microelectronics manufacturing industry as of the time of the invention:

> An example of the application of this invention is in the point of use (POU) purification of photochemicals used in the microelectronics manufacturing industry.  Photochemical dispense pumps and POU fluid separation devices are typically found in a drawer mounted beneath the spin coating apparatus.  There are sometimes as many as eight pumps per drawer, severely limiting access to POU fluid separation devices which may be close-coupled to the dispense pumps to eliminate extraneous external plumbing and potential fluid contamination.  Particularly suitable dispense pump and separation devices are those in which the pump and separation device form an integrated system as disclosed in U.S. Pat. No. 5,262,068 [*i.e.*, Bowers] whose disclosure is incorporated by reference.

Ex. 1, col. 4, ll. 9-24.  As noted by the specification, Bowers discloses all of the claimed features of claims 12 and 15-20.

Accordingly, claims 12 and 15-20 would have been obvious in view of Ogden in combination with Bowers.  Ex. 5, Paul Decl., ¶¶ 76-77.

g.    **Claim 24**

Claim 24 appears to have been directed to the internal structure of Pall's EZD-2 and

EZD-3 filter capsules that have been on the market sequentially for the past several years.  Claim

24 depends from claim 14 and is set forth in part below:

> The fluid processing system of claim 14, wherein the quick-connect
> manifold is mated with the disposable fluid separation module, the
> disposable fluid separation module comprising:
>
> a housing having a separation element contained within said housing …
> said separation element comprising a membrane, wherein said membrane
> comprises a microporous membrane, reverse osmosis membrane, or
> ultrafiltration membrane, and
>
> …
>
> a conduit in fluid communication with said first connector [the inlet
> connector] and said second end [bottom of the housing] so as to direct
> flow between said first connector and said second end;
>
> ….

It is only these clauses of the claim above that even arguably distinguish the claim from Ogden.

While Ogden does not literally disclose "a microporous membrane, reverse osmosis

membrane, or ultrafiltration membrane," a person of ordinary skill in the art would understand

this requirement to be nothing more than a routine design choice.  For example, the '770 patent

equates conventional fibrous filter media, such as that disclosed in Ogden, and the claimed

membrane filters:

> Furthermore, although specific reference has been made as to the type of
> separation element used, this invention is intended to be useful for any of
> the numerous varieties of separation elements known to those skilled in
> the art, as for example:  conventional filters, membrane filters (MF, UF
> and RO), chromotography columns, adsorptive media cartridges (e.g., ion
> exchange, activated carbon and specific ligands) and membrane filters
> embedded with adsorptive resin media.

Ex. 2, col. 8, ll. 18-26 (emphasis added).  Bowers also discloses membrane filters for use in the

microelectronics manufacturing industry:

> The separation element may be of the flat sheet membranes of the type
> described in U.S. Pat. No. 5,262,068 [*i.e.*, Bowers], or more preferably

> may be comprised of hollow fiber membranes of the type described in
> commonly assigned U.S. Pat. No. 5,762,789, which is incorporated herein
> by reference.

Ex. 1, col. 4, ll. 45-50. Both Yoon and Walz employ membrane elements for reverse osmosis

filtration applications. Ex. 5N, col. 9, ll. 7-10; Ex. 50, col. 2, ll. 42-46. The '789 patent discloses

hollow fiber membranes and reverse osmosis membranes for use in the microelectronics

industry. Ex. 5AA, col. 1, ll. 5-15, col. 4, ll. 55-67. A person of ordinary skill in the art would

have had a reasonable expectation of success using fluid separation modules having membrane

filters in the practice of Ogden.

Regarding the conduit limitation, Ogden does not literally disclose "a conduit" that

"direct[s] flow between said first connector and said second end." Ogden discloses an open

channel between the inlet connector and the bottom of the filter housing. Ex. 5H, Figs. 1-3.

Entegris' '789 patent and Thomsen describe a central conduit in fluid communication with the

inlet connector to direct flow between the inlet connector and the bottom of the filter housing.

Ex. 5AA, Figs. 1 and 3; Ex. 5L, Figs. 1 and 5. Jenkins describes a non-central conduit between

the inlet and bottom of the filter housing. Ex. 5M, Fig. 2. A person of ordinary skill in the art

would have been motivated and would have had a reasonable expectation of success in using a

fluid separation module having a conduit to direct flow from the first connector to the second end

in the practice of Ogden.

Accordingly, claim 24 would have been obvious in view of Ogden alone or in

combination with the '789 patent, Yoon, Walz, Bowers or Jenkins. Ex. 5, Paul Decl., ¶¶ 79-81.

**5.    Claim 24 is Invalid for Lack of Written Description**

In order to comply with the written description requirement of 35 U.S.C. § 112{ TA \l

"35 U.S.C. § 112" \s "35 U.S.C. § 112" \c 2 }, ¶ 1, a patentee must describe the invention with all

of its claimed limitations. *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir.

1998){ TA \l "*Gentry Gallery, Inc. v. Berkline Corp.*,

134 F.3d 1473 (Fed. Cir. 1998)" \s "Gentry" \c 1 }. The relevant inquiry is whether one of

ordinary skill in the art would have determined that the applicant was in possession of the claimed subject matter at the time of the original application filing date. *Ralston Purina Co. v. Far-Mar-Co, Inc.,* 772 F.2d 1570, 1575 (Fed. Cir. 1985){ TA \l "*Ralston Purina Co. v. Far-Mar-Co, Inc.,*

772 F.2d 1570 (Fed. Cir. 1985)" \s "Ralston" \c 1 }.  A claim amendment may not expand the written description in the original patent application.  35 U.S.C. § 132{ TA \l "35 U.S.C. § 132" \s "35 U.S.C. § 132" \c 2 }; *see also In re Wilder*, 736 F.2d 1516, 1520-21 (Fed. Cir. 1984){ TA \l "*In re Wilder*,

736 F.2d 1516 (Fed. Cir. 1984)" \s "In re Wilder" \c 1 } (affirming board's rejection of claims "for claiming subject matter not adequately disclosed in the original patent."); 37 C.F.R. § 1.121(f){ TA \l "37 C.F.R. § 1.121(f)" \s "37 C.F.R. § 1.121(f)" \c 4 } ("No amendment may introduce new matter into the disclosure of an application.").

 As discussed above, claim 24 requires "a conduit" that directs flow from the inlet connector to the bottom of the filter housing.  The specification of the '667 patent does not describe the internal structure of the fluid separation module apart from that fact that it contains a fluid separation element.  Nowhere does the specification of the '667 patent describe a conduit from the inlet connector to the bottom of the fluid separation module.  Nowhere does the specification of the '667 patent describe a conduit extending from a non-central inlet connector to the bottom of the filter housing as in Pall's EZD-3 filter capsules.

 The incorporation by reference of the '789 patent does not satisfy the written description requirement with respect to claim 24 of the '667 patent.  A patent may incorporate specific material of another patent by reference by clearly indicating what material the host specification incorporates from the referenced patent.  *See Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000){ TA \l "*Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272 (Fed. Cir. 2000)" \s "Advanced Display Sys., Inc. v. Kent State Univ., 212 F.3d

1272, 1282 (Fed. Cir. 2000)" \c 1 }.  The '667 patent incorporates the '789 patent only for its disclosure of the hollow fiber media, not the internal structure of the filter module:

> The separation element may be of the flat sheet membranes of the type described in U.S. Pat. No. 5,262,068 [*i.e.*, Bowers], or more preferably may be comprised of hollow fiber membranes of the type described in commonly assigned U.S. Pat. No. 5,762,789 [*i.e.*, the '789 patent], which is incorporated herein by reference.

Ex. 1, col. 4, ll. 46-50.  The incorporation of the hollow fiber membranes of the '789 patent followed the incorporation of the flat sheet membranes of Bowers, which the specification incorporates separately for other teachings, such as for describing Entegris' pump.  In contrast to the incorporation of Bowers in separate parts of the specification for various purposes, the specification does not incorporate the '789 patent for any purpose other than for its disclosure of hollow fiber membranes.

Further, the '789 patent itself does not support the broad conduit limitation of claim 24 of the '667 patent.  Claim 24 purports to cover a <u>non-central</u> conduit extending from the inlet connector.  This is informed by Entegris' allegation that Pall's filter capsules with a non-central conduit infringe claim 24.  In the '789 patent, however, the specification discloses only a <u>central</u> conduit, and every claim of the '789 patent recites a <u>central</u> conduit.  Entegris' '789 patent does not disclose or even suggest a <u>non-central</u> conduit and therefore cannot fill the deficiencies of the '667 patent for purposes of satisfying the description requirement of 35 U.S.C. § 112{ TA \s "35 U.S.C. § 112" }, first paragraph.

Accordingly, claim 24 is invalid under Section 112{ TA \s "35 U.S.C. § 112" } for lack of written description.

### C.    Entegris is Not Entitled to a Presumption of Irreparable Harm

Entegris is not entitled to a presumption of irreparable harm because it cannot make a "strong showing of likelihood of success" on the issue of validity.  *Roper Corp. v. Litton Sys., Inc.,* 757 F.2d 1266, 1271 (Fed. Cir. 1985){ TA \l "*Roper Corp. v. Litton Sys., Inc.,*

757 F.2d 1266 (Fed. Cir. 1985)" \s "Roper Corp. v. Litton Sys., Inc., 757 F.2d 1266, 1271 (Fed. Cir. 1985)" \c 1 }.  Further, the Supreme Court's recent decision in *eBay Inc. v. MercExchange, L.L.C.*, --- U.S. ---, 126 S.Ct. 1837, No. 05-130, 2006 WL 1310670 (May 15, 2006){ TA \l "*eBay Inc. v. MercExchange, L.L.C.*,

--- U.S. ---, 126 S.Ct. 1837, No. 05-130, 2006 WL 1310670 (May 15, 2006)" \s "eBay" \c 1 }, seriously calls into question the presumption of irreparable harm or otherwise failing to fully consider the traditional equitable factors that govern the providence of a preliminary injunction.

In *eBay*{ TA \s "eBay" }, the Supreme Court eliminated the Federal Circuit's practice of entering a *permanent* injunction as a "general rule … once infringement and validity have been adjudged." *Id.*, 2006 WL 1310670 at *3{ TA \s "eBay" }.  The Supreme Court remanded the case for the district court to make findings as to all of the traditional equitable factors that the court must consider prior to entering an injunction, such as irreparable harm, balance of hardships, and public impact.  *Id.* at *4{ TA \s "eBay" }.  The Supreme Court's decision in *eBay*{ TA \s "eBay" } is necessarily pertinent to the preliminary injunction stage as well, where the traditional equitable factors play an even greater role prior to a full trial on the merits.

In view of the likely invalidity and unenforceability (discussed further below) of the '667 patent, and further in view of the Supreme Court's decision in *eBay*{ TA \s "eBay" }, Entegris maintains the full burden of presenting clear evidence that it would suffer irreparable harm absent a preliminary injunction.

### D.    Entegris Presents No Evidence of Actual Irreparable Harm

Entegris relies solely on the presumption of irreparable harm and presents no evidence of actual irreparable harm.  Entegris complains that competition by Pall's EZD-3 filter capsules over the past two years has been eroding its market share and calling into question its pricing structure.  *See* Entegris Mem., p. 11.  As an initial point, Entegris has no legal basis to complain about activities prior to the issuance of the '667 patent on April 4, 2006.  Most, if not all of the Pall sales of which Entegris complains were made far in advance of the issuance of the '667

patent.  Ex. 7, Mesawich Decl., ¶ 10.  By seeking this injunction, Entegris effectively is

attempting to extend the term of its patent backwards to reach pre-issuance activities.  Moreover,

even if Pall's activities prior to April 4, 2006 were cognizable, Entegris does not present the kind

of "proof" of immediate, irreparable harm that can support the drastic remedy of a preliminary

injunction.  *See*, *e.g.*, *Frommelt Indus., Inc. v. W.B. McGuire Co.*, *Inc.* 504 F. Supp. 1180, 1184

(N.D.N.Y. 1981){ TA \l "*Frommelt Indus., Inc. v. W.B. McGuire Co.*, *Inc.*

504 F. Supp. 1180 (N.D.N.Y. 1981)" \s "Frommelt" \c 1 } ("[T]he fact that continued

competition pending trial may dampen plaintiff's sales does not constitute irreparable injury, for

such losses, if wrongful, can be adequately redressed by money damages."); *Illinois Tool Works,*

*Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990){ TA \l "*Illinois Tool Works, Inc. v.*

*Grip-Pak, Inc.*,

906 F.2d 679 (Fed. Cir. 1990)" \s "Illinois Tool Works" \c 1 }.

　　　　Even assuming *arguendo* that Entegris might lose some sales of its filter assemblies that

it might have made absent competition by Pall's EZD-3 filter assemblies, monetary damage will

adequately compensate Entegris if it were ultimately to prevail on its infringement claim.  Pall is

a healthy company that will clearly be able to answer for any damages in the unlikely event the

'667 patent is found to be valid, enforceable and infringed.  *See Nutrition 21 v. U.S.*, 930 F.2d

867, 871 (Fed. Cir. 1991){ TA \l "*Nutrition 21 v. U.S.*,

930 F.2d 867 (Fed. Cir. 1991)" \s "Nutrition" \c 1 } (denying a preliminary injunction in part

because the defendant was "a large and financially responsible company that would be

answerable in damages.").

　　　　Entegris simply waves its hands over the alleged loss of goodwill going forward absent a

preliminary injunction.  If Entegris truly had evidence of irreparable harm through loss of

goodwill, it should have presented such evidence by independent declaration or otherwise.

*Sierra Club v. Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991){ TA \l "*Sierra Club v. Larson*,

769 F. Supp. 420 (D. Mass. 1991)" \s "Sierra" \c 1 } ("Plaintiffs must establish injury that is not remote or speculative, but is actual and imminent.") (citing *U.S. v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953)).  In stark contrast, however, Entegris' motion is devoid of any such evidence, thus compelling a finding that there is no likelihood for actual and imminent irreparable harm absent an injunction.

Further, Entegris' actions are contrary to any assertion of irreparable harm.  Pall designed its EZD-3 filter assemblies to eliminate any arguable automatic alignment in direct response to Entegris' argument and the Court's finding that automatic alignment was a key aspect of the invention described by the '770 and '907 patents.  Entegris never indicated to Pall or to the Court during the 2003 action that the purported invention of the '907 patent (and hence the '667 patent) could cover Pall's non-aligning EZD-3 assemblies, or that it was pursuing claims in the '667 patent application without automatic alignment.  After two years of competition without any legitimate patent constraints, Entegris' silence is diametrically opposed to any presumption or assertion that it would suffer irreparable harm absent an immediate injunction.

Further, in this regard, Mykrolis has not been diligent in seeking patent protection.  The application that led to the '667 patent was filed on May 16, 2003—almost *seven years* after Entegris' predecessor filed its initial applications.  It waited another fifteen months to seek expedited prosecution.  Ex. 10, Petition to Make Special dated July 28, 2004.  Entegris' "lying in wait" for years before seeking coverage on its supposed "invention" is wholly inconsistent with any suggestion of irreparable harm.

Entegris has fallen far short of evidencing irreparable harm absent a preliminary injunction.

### E.    A Balancing of the Hardships Weighs Heavily Against a Preliminary Injunction

Another preliminary injunction would severely impact the market that Pall has developed with its EZD-3 filter assemblies introduced in mid-2004 and sold without complaint by Entegris

until now.  Ex. 7, Mesawich Decl., ¶¶ 11-15.  Pall and its customers have already felt the sting of one preliminary injunction stemming from Entegris' invalid '770 and '907 patents.  The Court's dissolution of that injunction came far too late in the eyes of Pall's customers, who now view Pall with a new skepticism.  *Id*. at ¶¶ 12-13.  One can only imagine the adverse impact of yet another injunction against Pall stemming from the very products it developed two years ago in response to the first preliminary injunction.  *Id*. at ¶ 11.

The potential hardship to Pall is simply too great for an injunction to ensue without the Constitutional safeguards of a jury trial on the merits.  *See Ethicon Endo-Surgery v. U.S. Surgical Corp.*, 855 F. Supp. 1500, 1507 (S.D. Ohio 1994){ TA \l "*Ethicon Endo-Surgery v. U. S. Surgical Corp.*,

855 F. Supp. 1500 (S.D. Ohio 1994)" \s "Ethicon" \c 1 } ("We are reluctant to use our equitable powers to disrupt rather than maintain the status quo in this highly specialized and sensitive product area.  ... Issuance of a preliminary injunction now would inflict significant harm on the Defendant.  In this case the status quo is best maintained by the denial of a preliminary injunction.").  Pall deserves its day in court after full discovery on the merits.

### F.    A Preliminary Injunction would be Contrary to the Public Interest

There exists a strong public interest in removing patent protection of invalid patents.  *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 100-101 (1993){ TA \l "*Cardinal Chem. Co. v. Morton Int'l, Inc.*,

508 U.S. 83 (1993)" \s "Cardinal" \c 1 }; *In re Baker Hughes Inc*., 215 F.3d 1297, 1302 (Fed. Cir. 2000){ TA \l "*In re Baker Hughes Inc*.,

215 F.3d 1297 (Fed. Cir. 2000)" \s "In re Baker Hughes" \c 1 }.  Further, a preliminary injunction against Pall's EZD-3 filter assemblies would create a new market condition where Entegris holds a monopoly.  Entegris' request for a preliminary injunction evidences Entegris' predatory attempt to monopolize the market—a market in which only Pall and Entegris compete.  An injunction against Pall now would be contrary to the public interest{ TA \l "*Novo Nordisk of*

*North America, Inc. v. Genentech, Inc.*,

77 F.3d 1364 (Fed. Cir. 1996)" \s "Novo" \c 1 **}**.

### G.    Entegris Cannot Invoke the Court's Equitable Powers

A court may grant a preliminary injunction only in accordance with the principles of

equity.  35 U.S.C. § 283**{** TA \l "35 U.S.C. § 283" \s "35 U.S.C. § 283" \c 2 **}**; *Intel Corp. v.*

*ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993)**{** TA \l "*Intel Corp. v. ULSI Sys.*

*Tech., Inc.*,

995 F.2d 1566 (Fed. Cir. 1993)" \s "Intel" \c 1 **}**.  Entegris cannot invoke the Court's equitable

powers because its infringement claim is barred under the doctrine of prosecution laches and

further because it engaged in inequitable conduct before the Patent Office in securing at least

claim 24 of the '667 patent.

### 1.    Entegris' Claim is Barred by Prosecution Laches

A court can bar a patentee from enforcing its patent if there was an unreasonable and

unexplained delay in obtaining the grant through the Patent Office.  *Symbol Techs., Inc. v.*

*Lemelson Med. Educ. & Res. Found., LP*, 422 F.3d 1378, 1384-85 (Fed. Cir. 2005)**{** TA \l

"*Symbol Techs., Inc. v. Lemelson Med. Educ. & Res. Found., LP*,

422 F.3d 1378 (Fed. Cir. 2005)" \s "Symbol Techs." \c 1 **}**.  Entegris delayed unreasonably and

inexcusably for seven years before filing the application giving rise to the '667 patent.  Even

after it belatedly filed that application, it was content to quietly observe what was going on in the

marketplace and in the 2003 action while it desperately sought an "invention" to pursue against

Pall.  Under these circumstances, Entegris' claim is barred by prosecution laches.

Entegris first filed the application giving rise to the '667 patent in mid-2003 ostensibly

claiming priority of an application filed back in mid-1996.  Since mid-1996, and even today,

Entegris has maintained a "live" application effected through a complex symphony of

continuation applications, inventorship changes, and claim amendments.  Entegris did not

finalize the claims of the '667 patent until late in 2005—just months prior to the issuance of the

'667 patent. While Entegris may argue that it sought to expedite the prosecution of the '667 patent application through so-called "petitions to make special," it did so only after eight years of unexcused delay. *See, e.g.*, *Cummins-Allison Corp. v. Glory, Ltd.*, No. Civ.A. 02C7008, 2003 WL 22125212, *17 (N.D. Ill. Sept. 5, 2003){ TA \l "*Cummins-Allison Corp. v. Glory, Ltd.*, No. Civ.A. 02C7008, 2003 WL 22125212 (N.D. Ill. Sept. 5, 2003)" \s "Cummins-Allison" \c 1 } (denying preliminary injunction because plaintiff delayed seven years in pursuing claims covering the accused device).

When Entegris filed the patent application giving rise to the '667 patent in 2003, it did so in response to Pall's citation of anticipatory prior art to the parent '770 and '907 patents. Entegris initially added automatic alignment to the claims in a preliminary amendment, probably as a safety net in case the Court refused to interpret the claims of the '907 patent as calling for automatic alignment. Ex. 10, Preliminary Amendment dated May 16, 2003. Eventually, in April 2004, the Court did find automatic alignment as a key feature of the Entegris invention and on that basis distinguished the '907 patent claims from the prior art. *See* 2003 Docket No. 66, Memorandum and Order dated April 30, 2004, pp. 17-19. Pall then introduced its non-aligning and non-infringing EZD-3 filter assemblies in May 2004. *See* 2003 Docket No. 75, Pall's Report Regarding Compliance with the Preliminary Injunction. In response, in July 2004, Entegris again amended the claims, this time by removing automatic alignment. Ex. 10, Second Supplemental Preliminary Amendment dated July 28, 2004. It was only in April 2005 that Entegris settled on its three-connector-on-top invention. Ex. 10, Amendment dated April 8, 2005.

The circumstances compel one conclusion—that Entegris has abused the permissive continuation practice in order to disrupt Pall's business and to monopolize the market. No action by the Patent Office precipitated the almost nine year delay by Entegris in pursuing the asserted claims of the '667 patent. Entegris' unreasonable and inexcusable delay in pursing the claimed

subject matter of the '667 patent represents a classic case of prosecution laches. *See, e.g.*, *Symbol Techs.*, 422 F.3d at 1384-1385{ TA \s "Symbol Techs." }; *Cummins*, 2003 WL 22125212 at *17{ TA \s "Cummins-Allison" } (finding the doctrine of prosecution laches particularly appropriate where a patentee does not file the asserted claims until after it has seen a competitors' product on the market).

The Court should deny the request for a preliminary injunction because Entegris is guilty of prosecution laches.

### 2.    Entegris Engaged in Inequitable Conduct before the Patent Office to Procure Claim 24 of the '667 Patent

Inequitable conduct is a breach of the duty of candor through a material misrepresentation together with intent to mislead the Patent Office. *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1233 (Fed. Cir. 2003){ TA \l "*Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*,

326 F.3d 1226 (Fed. Cir. 2003)" \s "Bristol-Myers" \c 1 }.  To determine whether equity warrants the revocation of a patent grant, the courts weigh the materiality of the misrepresentation against the intent to deceive. *Id*. at 1234{ TA \s "Bristol-Myers" }.  Inequitable conduct as to one claim renders the entire patent unenforceable. *J.P. Stevens & Co., Inc. v. Lex Tex, Ltd., Inc.*, 747 F.2d 1553, 1561-62 (Fed. Cir. 1984){ TA \l "*J.P. Stevens & Co., Inc. v. Lex Tex, Ltd., Inc.*,

747 F.2d 1553 (Fed. Cir. 1984)" \s "J.P. Stevens" \c 1 }.  If a patent applicant falsely represents that it added no new matter by way of the amendments, then such misrepresentation can give rise to a finding of inequitable conduct. *See, e.g.*, *Neutrino Dev. Corp. v. Sonosite, Inc.*, 410 F. Supp. 2d 529, 544 (N.D. Ill. 2006){ TA \l "*Neutrino Dev. Corp. v. Sonosite, Inc.*,

410 F. Supp. 2d 529 (N.D. Ill. 2006)" \s "Neutrino" \c 1 } (finding that the patentee's statement that "no new matter has been added" could give rise to a finding of inequitable conduct); *Turbocare Div. of Demag Delaval Turbomachinary Corp. v. Gen. Elec. Co.*, 264 F.3d 1111, 1118 (Fed. Cir. 2001){ TA \l "*Turbocare Div. of Demag Delaval Turbomachinary Corp. v. Gen.

*Elec. Co.,*

264 F.3d 1111 (Fed. Cir. 2001)" \s "Turbocare" \c 1 } (stating the new matter prohibition

"serve(s) to ensure that the patent applicant was in full possession of the claimed subject matter

on the application filing date.").

Entegris represented to the Patent Office that the added subject matter of claim 24 was

not "new matter" in violation of 35 U.S.C. § 132{ TA \s "35 U.S.C. § 132" }, meaning that the

claim amendments purportedly added only those limitations described in the '667 patent

specification.  Ex. 10, Amendment dated April 8, 2005 ("No new matter is added.").  By adding

limitations in claim 24 that cover subject matter clearly not described in the '667 patent

specification nor any patent reference incorporated therein, however, Entegris violated the

prohibition against the addition of new matter.  It was a material misrepresentation to deny the

addition of new matter.

Entegris' motivation for making the misrepresentation to the Patent Office stems from the

history of the '789 patent and from this litigation.  In the '789 patent, applied for in 1996 shortly

before the filing of the application that led to the '770 patent, Entegris' predecessor obtained

claims covering its quick-connect filter capsule having a <u>central</u> conduit inside the filter housing

extending from the inlet connector to the bottom of the housing.  The '789 patent does not

disclose nor even suggest a filter capsule having a <u>non-central</u> conduit.  Pall's EZD-3 filter

capsules contain a non-central conduit and cannot be said to infringe Entegris' '789 patent.  Nor

has Entegris ever suggested otherwise in the eight years since the '789 patent issued in June

1998.

After the setbacks in January 2005 of this Court holding that Pall's EZD-3 filter

assemblies likely did not infringe the '770 and '907 patents, and that Entegris' patents were

likely invalid in view of the prior art, Entegris added claim 24 to the pending application of the

'667 patent.  Ex. 10, Amendment dated April 8, 2005.  In doing so, and misrepresenting that no

new matter was added, Entegris captured subject matter in claim 24 of the '667 patent that it could not have obtained in the '789 patent and to which it was not entitled in the '667 patent.

The Patent Office clearly did not confirm Entegris' statement that no new matter had been added in claim 24 against the specification of the '667 patent. Instead, it appears that the Patent Office simply relied on Entegris' statement that the specification supported claim 24. But for Entegris' misrepresentation, the Patent Office likely never would have allowed claim 24. As discussed in Section III.F, above, Entegris and its counsel must be presumed to have known exactly what they were doing. The Court should deny Entegris' request for a preliminary injunction because it violated its duty of candor before the Patent Office in securing asserted claim 24 of the '667 patent.

## V.    CONCLUSION

Entegris has not made the strong showing required in order to justify the extraordinary relief it seeks. For at least the reasons expressed herein, the Court should deny Entegris' motion for a preliminary injunction.

Date:  June 1, 2006                     Respectfully submitted,


                                        /s/ Gary R. Greenberg
                                        H. Michael Hartmann
                                        Mark E. Phelps
                                        Jeremy C. Lowe
                                        LEYDIG, VOIT & MAYER, LTD.
                                        Two Prudential Plaza, Suite 4900
                                        Chicago, IL  60601-6780
                                        (312) 616-5600

                                        Gary R. Greenberg, B.B.O. No. 209420
                                        Louis J. Scerra, Jr., B.B.O. No. 543600
                                        Greenberg Traurig, LLP
                                        One International Place, 20th Floor
                                        Boston, MA  02110
                                        (617) 310-6000

                                        ATTORNEYS FOR DEFENDANT
                                        PALL CORPORATION

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on June 1, 2006.

/s/ Gary R. Greenberg
Gary R. Greenberg