UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 06-10601-GAO

ENTEGRIS, INC.,
Plaintiff

v.

PALL CORPORATION,
Defendant

OPINION AND ORDER
March 31, 2008

O'TOOLE, D.J.

**I.     Background**

In the semiconductor industry, semiconductors are manufactured in a process that involves "spin-coating" a semiconductor wafer with liquid photochemicals that are dispensed by specialized pumps onto the wafer in a uniform thin film. "Point-of-use" filtration systems are used in conjunction with a dispense pump to purify the liquid photochemicals being applied to the wafer. The filters must be replaced periodically, and it is desirable that replacement be accomplished quickly (for efficiency) and without spillage (for product quality and worker safety).

The plaintiff, Entegris, Inc. and the defendant Pall Corporation both manufacture and sell filtration systems for the semiconductor industry. Entegris is the assignee of U.S. Patent No. 7,021,667 (the "'667 Patent"), which issued on April 4, 2006. The '667 Patent claimed the priority of applications filed in July 1996 and July 1998 that resulted in U.S. Patent Nos. 6,068,770 (the "'770 Patent") and 6,378,907 (the "'907 Patent"), respectively.

The '770 and '907 Patents disclose aspects of a filtration, or "fluid separation," system with "quick-connect" disposable filter modules to facilitate the quick and easy change-out of the filter. Entegris' predecessor, Mykrolis Corporation, sold its quick-connect manifold assemblies and disposable fluid separation modules as part of the IngelliGen dispense pump / photochemical filtration system, as well as a stand-alone version of its quick-connect manifold and fluid separation module sold without a pump. Pall manufactured and sold a device referred to as the PhotoKleen™ EZD-2 Filter Assembly (the "EZD-2"), which was its version of a quick-connect manifold assembly with a disposable fluid separation module.

In a previous action between Pall and Mykrolis, I issued a preliminary injunction enjoining Pall from infringing the '770 and '907 Patents, and from making, using, selling, or importing into the United States, the EZD-2. <u>Mykrolis Corp. v. Pall Corp.</u>, No. 03-10392-GAO (D. Mass. Apr. 30, 2004) (order granting preliminary injunction).

Pall then began selling the PhotoKleen™ EZD-3 Filter Assembly ("EZD-3"), a manifold assembly for quickly connecting and disconnecting a disposable fluid separation module for point-of-use filtration of photochemicals for the semiconductor industry. Pall has also sold a product known as the "EZD-3 Retrofit," which Entegris alleges is designed to be installed on an Entegris pump, allowing a Pall module to be used instead of an Entegris module. These devices had been redesigned to avoid infringement by removing the "automatic alignment" feature which I had found was an important aspect of the Mykrolis invention.

On January 12, 2005, on Mykrolis' application, I held Pall in contempt for violating the injunction, but dissolved the injunction because, in defending against contempt, Pall had raised a significant question as to whether the '770 and '907 Patents were invalid because they were obvious

in light of prior art. Mykrolis Corp. v. Pall Corp., No. 03-10392-GAO (D. Mass. Jan. 12, 2005) (order dissolving preliminary injunction).

The '667 Patent, now at issue, includes claims directed to further aspects of Entegris' quick-connect manifold and disposable fluid separation module invention, the most relevant being the removal of air bubbles from the filter module via a dedicated gas vent. The presence of air bubbles in the filter module is problematic because the bubbles cause variations in the volume of liquid dispensed. The '667 Patent discloses a manifold assembly having at least three connectors between the fluid connector member and the disposable fluid separation module, with at least one fluid outlet, one fluid inlet, and one gas vent. During a vent cycle, the outlet conduit from the filter module is closed, and the vent valve is opened. A small amount of liquid photochemical is pushed into the filter to sweep up stray bubbles, and push them out of the filter housing, and the stream of bubbles and liquid chemicals is usually expelled as waste through the gas vent.

Entegris now alleges that Pall's EZD-3 infringes the '667 Patent, and has moved for a preliminary injunction that would enjoin Pall from infringing the '667 Patent generally and by means of the EZD-3 product specifically. To be entitled to preliminary injunctive relief, Entegris must demonstrate that it has a reasonable likelihood of success on the merits, that it would suffer irreparable harm if the injunction is not granted, that the balance of hardships tip in its favor, and that the injunction would be in the public interest. See Nat'l Steele Car, Ltd. v. Canadian Pac. Ry. Ltd., 357 F.3d 1319, 1324–25 (Fed. Cir. 2004).

## II. Likelihood of Success on the Merits

To demonstrate a reasonable likelihood of success on the merits, Entegris must show that at trial it is likely to prove infringement and that its infringement claim will likely withstand Pall's

challenges to validity of the '667 Patent. See id. at 1325. Pall has not, in opposing Entegris' motion, contested the issue of infringement. Instead, it argues that the '667 Patent is invalid on the basis of obviousness, see 35 U.S.C. § 103(a), and the on-sale bar, see 35 U.S.C. § 102(b), as well as unenforceable because of prosecution laches and inequitable conduct.

Entegris' '667 patent is presumed valid, and Pall has the burden at trial of proving invalidity by clear and convincing evidence. See 35 U.S.C. § 282; Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc., 796 F.2d 443, 446 (Fed. Cir. 1986). However, to obtain a preliminary injunction, Entegris must carry its burden of establishing a likelihood of success on the issue of validity. That is, if Pall raises substantial questions as to validity, Entegris must show that these invalidity defenses lack substantial merit. See Heliflix, Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1351 (Fed. Cir. 2000.) At the preliminary injunction stage, Pall can raise a substantial question of invalidity "on evidence that would not suffice to support a judgment of invalidity at trial." See Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1358 (Fed. Cir. 2001). Pall need not make out a case of actual invalidity, but merely vulnerability. See id. at 1359.

A.  Nonobviousness

The '667 Patent includes four independent claims, numbers 1, 2, 14, and 25. The parties have focused their arguments on claim 2.[1]  Pall argues that claim 2 is obvious in light of prior art, and therefore unpatentable under 35 U.S.C. § 103(a) ("A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter

---

[1] If claim 2 is invalid, it is likely the other claims are as well, because the same considerations would apply to them.

4

as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."). To make a determination regarding obviousness, the elements of claim 2 must be construed. See Interactive Gift Express v. Compuserve, Inc., 256 F.3d 1323, 1330 (Fed. Cir. 2001). The first step is to look to the language of the claim itself. K-2 Corp. v. Salomon S.A., 191 F.3d 1356, 1362 (Fed. Cir. 1999). The terms of a claim are to be given their ordinary and customary meaning, which is the meaning that they would have to a person of ordinary skill in the relevant art. See Phillips v. AWH Corp., 415 F.3d 1303, 1312–13 (Fed. Cir. 2005). Where the meaning of a claim term is not immediately apparent, the context in which the term is used, the usage of the term in other claims, and the differences between claims may be instructive. See id. at 1314. In addition to the claim language, the court may look to other intrinsic sources such as the specification and the prosecution history, if in evidence. See id. If necessary, the court may also look to extrinsic evidence, such as expert and inventor testimony. See id. at 1317.

    *1.     Construction of Claim 2 of the '667 Patent*

The '667 patent is entitled "Connector Apparatus and System Including Connector Apparatus." Claim 2 of the '667 patent claims an invention as follows:

> 2. A quick-connect manifold assembly for a disposable fluid separation module, comprising:
> a fluid connector member comprising a first set of at least three connectors extending through the fluid connector member, the connectors being spaced apart and parallel to one another, and
> a module receptor configured with the fluid connector member so as to provide the module receptor a limited range of first movement relative to the fluid connector member, the module receptor receiving a disposable fluid separation module having a second set of connectors, the first set of connectors capable of being substantially simultaneously engaged to, or disengaged from, the second set of connectors on the disposable fluid separation module by the first movement of the module receptor;
> wherein at least one connector of the first set of connectors is for introducing liquids to the disposable fluid separation module, at least one connector of the

>first set of connectors is for withdrawing liquids from the disposable fluid separation module, and at least one connector of the first set of connectors is a gas vent from the disposable fluid separation module.

'667 Patent col. 7 ll. 26–48.

As an initial matter, the parties dispute the significance of the description of the fluid separation module as "disposable." Pall argues that it is a non-limiting statement of purpose or intended use. Entegris argues that claim 2 is directed to a manifold that is defined by the environment in which it is intended to function, and that a disposable fluid separation module is therefore a limitation.

"Disposable" is first used in claim 2's preamble: "A quick-connect manifold assembly for a *disposable* fluid separation module…." '667 Patent col.7 ll.26–27 (emphasis added). The preamble generally does not limit the claim it precedes. See Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1346 (Fed. Cir. 2002). The preamble may be limiting, however, if it is "'necessary to give life, meaning and vitality'" to the claim. See id. (quoting Kropa v. Robie, 187 F.2d 150, 152 (CCPA 1951)). "Disposable" is also used again in the body of claim 2, in relation to the module receptor ("the module receptor receiving a disposable fluid separation module having a second set of connectors"), the set of connectors on the fluid connector member ("capable of being substantially simultaneously engaged to, or disengaged from, the second set of connectors on the disposable fluid separation module") and the purpose of each connector ("introducing liquids to the disposable fluid separation module … withdrawing liquids from the disposable fluid separation module … gas vent from the disposable fluid separation module.") '667 Patent col. 7, ll. 35–48.

Claim 2 is clearly directed to a "quick-connect manifold assembly," and to a fluid separation module that will fit and work satisfactorily with the assembly. It requires only a fluid separation module as described that is capable of being inserted and then removed after use, not necessarily one that is disposable. A reusable module designed to be inserted and removed in the same way would fit the claims just as well. Accordingly, I conclude that the word "disposable" does not breathe life or meaning into claim 2, but is rather merely a statement of what might be typically more desirable as a feature of the fluid separation module. It does not alter in any way the understanding of the quick-connect manifold assembly claimed in claim 2.

I construe Claim 2 as including the following elements:

> a. "a fluid connector member comprising a first set of at least three connectors extending through the fluid connector member, the connectors being spaced apart and parallel to one another"

The assembly has a fluid connector member with a group of at least three connectors extending through the fluid connector member. The connectors are spaced apart and parallel to one another.

> b. "a module receptor configured with the fluid connector member so as to provide the module receptor a limited range of a first movement relative to the fluid connector member, the module receptor receiving a disposable fluid separation module having a second set of connectors, the first set of connectors capable of being substantially simultaneously engaged to, or disengaged from, the second set of connectors on the disposable fluid separation module by the first movement of the module receptor"

The assembly has a module receptor that has a limited range of movement relative to the fluid connector member. The module receptor accepts a fluid separation module that has a second group of connectors. The movement of the receptor relative to the fluid connector member engages the first

group of connectors on the fluid connector member to the second group of connectors on the separation module. This engagement occurs essentially simultaneously for all the mating pairs of connectors. The movement of the receptor relative to the fluid connector member also disengages these connectors. The disengagement occurs essentially simultaneously for all the mating pairs of connectors.

> c. "wherein at least one connector of the first set of connectors is for introducing liquids to the disposable fluid separation module, at least one connector of the first set of connectors is for withdrawing liquids from the disposable fluid separation module, and at least one connector of the first set of connectors is a gas vent from the disposable fluid separation module."

This element of claim 2 is vigorously disputed by the parties. It is clear that there must be at least three connectors, and that there must be "at least one" which is an inlet, "at least one" that is an outlet, and "at least one" that is a gas vent. The question is whether this requires that each connector function exclusively as either an inlet, outlet, or gas vent, or whether the connectors can serve multiple functions.

Entegris argues that the plain reading of the claim language dictates that of the three or more connectors, one is exclusively an inlet, a second is exclusively a outlet, and a third is exclusively a gas vent. Entegris further argues that "a gas vent" means a connector whose primary purposes is to vent air from the module. Pall argues that each connector can serve multiple functions and that "a gas vent" is any connector through which air may escape, as would occur, for example, during the priming of the filter, so that it is no different from an outlet. In other words, Pall suggests that "at least one connector of the first set of connectors is a gas vent" should be read to suggest that a connector is a gas vent, but may also serve other functions.

The use of the word "is" does not necessarily convey exclusivity. Things can have multiple attributes. The question is whether stating that a connector *is* a gas vent means that it *is not* also an outlet or an inlet for fluid. The answer comes from the context of the claim language, which relates the three connectors to three distinct functions. By separately stating that there is to be "at least one connector" for each of the three functions, the implication is that the functions are performed individually by that specific connector, and not in aggregate by some combination of dual-purpose connectors. To read the claim otherwise would obviate the need to have a set of "at least three connectors," if only one or two connectors were to perform the same three functions. The clear reading of the language is that "at least one" plus "at least one" plus "at least one" must equal "at least three," which would only make sense if each connector had one intended purpose.

The phrase "gas vent" clearly implies that its main purpose is to vent gas. To construe the phrase otherwise would be to equate it with "a connector," and to ignore the fact that the other connectors are similarly limited by the more specific phrases of "introducing liquids" and "withdrawing liquids." The limitation that at least one connector be "a gas vent" modifies and narrows the claim from simply "a connector." Furthermore, the gas vent is not limited to a connector that only vents gas — that is just the main purpose. As the specification reveals, the gas vent actually is a conduit for "a small amount of liquid and any microbubbles therein" because the gas venting is accomplished by using a small amount of liquid to sweep the bubbles towards and out of the gas vent. See '667 Patent col. 6, ll. 31–32.

I therefore construe this element of claim 2 to require at least three connectors, a first being an inlet for introducing liquids to the module, a second being an outlet for withdrawing liquids from the filter module, and a third being a gas vent which has the primary purpose of venting gas from the filter module.

*2.     Obviousness Analysis*

Pall argues that claim 2 is obvious in light of prior art, and the question is whether Pall has raised a substantial question as to whether the invention as a whole would have been obvious to a person of ordinary skill in the art in view of the prior art. See 35 U.S.C. § 103(a). It is not enough simply to find each claim element in the prior art — there must be some teaching, motivation, or suggestion to combine the prior art in the manner claimed. In re Kotzab, 217 F.3d 1365, 1369–70 (Fed. Cir. 2000). This motivation can come from the prior art itself, the knowledge of a person of ordinary skill in the arts, or even from the nature of the problem to be solved. DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H., 464 F.3d 1356, 1361 (Fed. Cir. 2006); Brown & Williamson Tobacco Corp. v. Philip Morris, Inc., 229 F.3d 1120 (Fed. Cir. 2000). However, the question is not whether the difference between the claimed invention and the prior art seems obvious in hindsight, but whether, prior to the claim of invention, the putative invention would have been obvious to a person of ordinary skill in the art from the prior art as a whole. See Carl Schenck A.G. v. Nortron Corp., 713 F.2d 782, 785 (Fed. Cir. 1983). The prior art must further reveal to a person of ordinary skill that there would be a reasonable expectation of success in making the claimed device. In re Vaeck, 947 F.2d 488, 493 (Fed. Cir. 1991). Much of the prior art proffered by Pall was reviewed by the PTO during the examination that resulted in the '667 patent, which makes Pall's ultimate burden of proving invalidity more difficult to meet. See Bausch & Lomb, Inc.,796 F.2d at 447.

I conclude that Pall's argument that claim 2 is obvious in light of the prior art raises a significant question as to validity that cannot be said to lack substantial merit, and that the argument has enough merit to persuade me that the requested preliminary injunction ought not be granted.

Much of the parties' argument focuses on U.S. Patent No. 3,727,764 ("Ogden"), a patent from 1973 which discloses a filter for drinking water. Ogden discloses a quick-connect manifold for a multi-connector fluid separation module. The manifold has two parallel connectors: an inlet that introduces water to a filter module, and an outlet that withdraws water from a filter module.[2]

Entegris argues that Ogden does not disclose a module receptor that receives the filter module, and instead teaches that the filter module be inserted manually into the manifold, rather than being inserted first into a "receptor" and then connected to the manifold by movement of the receptor. The manual connection is described in Ogden's specification in relation to an embodiment shown in its Figure 1. See '764 Patent, col. 3, ll. 1–9. After the filter has been connected to the manifold, the housing is put in place over the filter and secured to the manifold. Figure 2 shows an alternate manner of fixing the housing to the manifold, also after manual connection of the filter cartridge. Ogden's Figure 3 embodiment shows a third way of putting the housing in place, illustrating a hinge which allows the housing to pivot into alignment with the manifold so that it can be secured. The disclosure is somewhat ambiguous, and the parties dispute whether the Figure 3 embodiment in Ogden calls for the filter to be placed in the housing before the housing pivots into position where it can be fully secured, or whether the housing pivots over and encloses the filter already manually connected with the manifold. The former possibility is not directly described or depicted in the Ogden patent, but the argument might be that it is the only realistic way to practice the embodiment shown

---

[2] The parties dispute whether a structure that extends perpendicularly from the inlet connector as shown in all the illustrations within the Ogden patent is a gas vent or not. The patent does not address the structure and makes no mention of venting. It would be pure speculation to regard the structure as a vent. To the extent speculation were undertaken, one might just as plausibly speculate that the structure depicts a valve controlling the flow of water through the inlet conduit 21 (to which it is adjacent) into the body of the filter. I do not agree with Pall that the structure would be interpreted by a person of ordinary skill in the art as a gas vent.

11

in Figure 3. As actually drawn, Figure 3 shows that once the filter has been connected, it is physically impossible to pivot the housing over it, because the body of the filter impedes the movement of the housing into the proper position. This inoperability might mean that any artisan of ordinary skill contemplating how to practice this embodiment would understand that the only way it could work would be to place the filter first within the housing and then to pivot the housing and enclosed filter cartridge together so that the filter conduit extensions would connect with the inlet and outlet conduits of the manifold. This would suggest to a person of ordinary skill in the art the use of a receptor that could be moved in relation to the manifold in a way that could connect a filter module placed within the receptor, as claimed in the '667 Patent.

A principal problem with this argument is that the limited description of the Figure 3 embodiment that is contained in the specification states that it, along with the Figure 2 embodiment, "operate[s] in substantially the same manner as the first." '764 Patent, col. 4, ll. 9-10. The description of the first embodiment is quite explicit that the filter cartridge is first inserted into the manifold and the housing is then placed over it. '764 Patent, col. 3, ll. 1-13.

Consequently, I do not find that Ogden's Figure 3 discloses an apparatus by which the filter assembly is attached to the manifold by means of a movement of a receptor that has received the filter cartridge.

That does not mean, however, that Ogden has no significance with respect to the obviousness question. Ogden teaches a module and manifold that connect with two connectors. For purposes of the present controversy, the number of connectors itself is not a significant difference between Ogden and the '667 Patent. The latter itself explains that "[d]isposable modules usually require that multiple connections be made sequentially, a minimum of two connections, and more typically three or four." '667 Patent, col. 2, ll. 16–19. Other pieces of prior art disclose three connectors in devices used for

water filtration where one connector is an inlet, a second is an outlet for filtered water, and a third is an outlet for unfiltered water (a "retentate" outlet). See U.S. Patent No. 5,601,710 (filed Jul. 10, 1995) ("Yoon"); U.S. Patent No. 5,133,858 (filed Nov. 30, 1989) ("Walz").

But, as noted, Ogden does not itself suggest adding a third connector that is specifically a gas vent. The question thus becomes, Would a person of ordinary skill in the art be motivated to combine the teaching of Ogden with other prior art to add a gas vent as described in claim 2 of the '667 Patent? Such motivation might be found not only in prior art references, but also in "any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself." DyStar, 464 F.3d at 1361.[3]

As to the last category, Entegris acknowledges that the critical need for venting air bubbles was well-known in the semiconductor manufacturing industry. Thus, a skilled artisan considering Ogden would clearly be motivated to modify the apparatus disclosed there it so as to provide an outlet for the required venting. This need alone might be enough to render the addition of a gas vent obvious.

Pall also argues that a person of ordinary skill would have been motivated by the disclosures in U.S. Patent No. 5,262,068 ("Bowers") to add a gas vent to Ogden's filter and manifold assembly. Bowers is a filter and manifold assembly connected to a feed pump and a dispense pump for use in the semiconductor manufacturing industry. The process of replacing the filter in Bowers is illustrative of the problems that the inventors of the '667 Patent were faced with. It did not have a quick-connect feature, and as a result changing the filter was time-consuming and could result in spillage of

---

[3] "It is important in this inquiry to distinguish between the references sought to be combined and the 'prior art,' as the latter category is much broader. For example, textbooks or treatises may include basic principles unlikely to be restated in cited references." DyStar, 464 F.3d at 1360.

expensive and hazardous semiconductor processing fluids. However, Bowers does disclose three channels that run to and from the filter chamber 116: fluid is introduced to the filter chamber 116 through filter chamber inlet channel 104, filtered fluid is withdrawn from the filter chamber through filtered-fluid channel 176, and filter chamber vent 184 extends between filter chamber 116 and vent valve 195. See '068 Patent, col. 7, ll. 14–22. These three channels are clearly shown in the Figure 1 embodiment of Bowers as parallel and spaced apart. See id. at fig.1. Unlike the gas vent of claim 2 of the '667 Patent, the vent channel in Bowers does not go directly into the filter module, but rather into the filter chamber into which the filter module is placed. Accordingly, the parties dispute whether or not Bowers actually discloses a gas vent of the type in claim 2 in the '667 Patent. This might be important in considering whether Bowers alone would make claim 2 obvious, but insofar as the question is whether Bowers would provide the motivation to add a gas vent to Ogden, it is really beside the point. At a minimum, Bowers discloses a vent channel that is *separate* from the two other parallel channels that are, respectively, an inlet and an outlet. Ogden has connectors that connect the manifold to the filter module as claim 2 of the '667 Patent requires, so if a third conduit were to be added it would be obvious to make it a connector just like the others. Bowers, in combination with the well-known need to vent gas bubbles during the filtration process for spin-coating in the semiconductor manufacturing industry, might very well have made it obvious to add a gas vent to Ogden.

      Conversely, it appears likely that a person of ordinary skill in the art would be motivated by Ogden to modify Bowers. As noted, Bowers was used in the semiconductor manufacturing industry but the process of replacing the filter was cumbersome and time-consuming. Industry demands for efficient and easy filter change-outs might well motivate a person of ordinary skill in the art to incorporate quick-connect filtration devices even from outside the semiconductor industry, such as

the drinking water filter in Ogden, because of the desirability of a quick-connect manifold and filter module. Since Bowers already used three parallel channels that were an inlet, an outlet and a vent, there would be a felt need to adapt these channels to a quick-connect device in the same way disclosed in Ogden: parallel, spaced apart, and connecting the manifold to the filter module. Regardless of whether a person of ordinary skill were to begin with Bowers or Ogden, it appears likely that there would be a motivation to combine them with a reasonable likelihood of success.

Moreover, Ogden teaches a quick-connect filter module that is inserted into an accepting manifold by an upward movement. All Ogden says about this insertion is that it occurs. '764 Patent, col. 3, ll. 3-7 ("The filter cartridge 25 is then inserted within the upper portion of the cavity formed by the manifold 11 and aligned to position the extensions 37 and 38 into the inlet and outlet conduits 21 and 23 respectively."). It does not say the insertion is done manually, although that is an obvious way of doing so and, from the entire context of the description, plainly what Ogden envisioned.

In another context, however, it might be similarly obvious that the insertion could be accomplished by a simple mechanical means. After all, the history of automation in industrial production has been the substitution of mechanical performance of tasks for manual performance. Regularity, rapidity, safety, precision all motivate such substitution. See Dystar, 464 F.3d at 1368 (noting that the urge to make products "stronger, cheaper, cleaner, faster, lighter, smaller, more durable, or more efficient" can motivate improvements even in the absence of suggestions to combine references in the references themselves). Evaluating whether there is an adequate suggestion to combine features of prior art "not only permits, but *requires*, consideration of common knowledge and common sense." Id. at 1367. (emphasis in original) To adapt the Ogden-disclosed manually accomplished quick-connect insertion of the filter module into the manifold to a mechanically accomplished movement would not likely be a task that would require more than the general

knowledge and experience of a person skilled in engineering sophisticated industrial equipment like the semiconductor dispensing pumps and filters that Entegris and Pall manufacture and sell. In other words, such a person would not have to call on more than commonplace background information to understand that what can be accomplished by grasping a module in a human hand and then moving it upward into engagement by motion of the arm could also be accomplished by grasping the module in a mechanical "hand" (a "receptor") and moving it upward into engagement by motion of a mechanical "arm." The precise designs of such a mechanism could vary, but the elements essential to the task would be obvious.[4]

For all these reasons, I conclude that there is a substantial question as to the obviousness of claim 2 of the '667 Patent. Entegris has not shown that Pall's argument for obviousness lacks substantial merit, and it is therefore unable to meet its burden of showing a likelihood of success on the merits of its infringement claim.

B.     On-Sale Bar

Pall has also raised a substantial question whether the '667 Patent is invalid because of the on-sale bar, 35 U.S.C. § 102(b), pursuant to which an applicant is not entitled to a patent if "the invention was … on sale in this country, more than one year prior to the date of the application for patent…." Pall's argument is that the '667 Patent is not entitled to the priority date of the application that first resulted in the issuance of the '770 Patent (July 12, 1996) because the specification of the '770 Patent does not disclose a gas vent. That crucial feature was added by the later continuation-in-part application that resulted in the issuance of the '907 Patent. The filing date of that application was

---

[4] If some specific prior art reference were thought to be necessary, as pertains here it could be found in the Sumitomo reference (Japanese Kokai Patent Application No. Hei 5[1993]-154201) or U.S. Patent No. 5,507,530 ("Maheny").

July 10, 1998. Treating that latter date as the applicable priority date for the '667 Patent, Pall argues that the on-sale bar was violated because the Intelligen pump/manifold combination, which anticipates the claims of the '667 Patent, was on sale by Entegris' predecessor Millipore as of April, 1997.[5]

In response, Entegris asserts that the '770 Patent does disclose a gas vent. Entegris argues that a person of ordinary skill in the art would have recognized that one of the three connectors is a gas vent in light of prior art, specifically U.S. Patent No. 5,762,789 ("the '789 Patent"). The '789 Patent is for a membrane filtration module for use in a fluid processing system, and includes three connectors: an inlet, an outlet for filtered liquid (permeate), and a third connector that can, according to the disclosure, be either a vent or an outlet for unfiltered liquid (retentate). Because neither the '770 Patent nor the July 1996 application explicitly mentions a gas vent (or any other kind), Entegris argues that the '789 Patent, and thus its reference to a gas vent, was incorporated by reference into the '770 Patent by the following language:

> The separation element may be of the flat sheet membrane type as described in U.S. Pat. No. 5,262,068, or more preferably may be composed of hollow fiber membranes of the type described in commonly assigned co-pending U.S. Application Ser. No. 08/674,599, filed Jun. 28, 1996, filed by Niermeyer and de los Reyes on Jun. 28, 1996 [resulting in the '789 Patent], whose disclosure is hereby incorporated by reference.

'770 Patent col. 5, ll. 57–63.

To incorporate another document by reference, "the host document must identify with *detailed particularity* what specific material it incorporates and *clearly indicate where* that material

---

[5] Entegris stated that "[t]he plaintiff began selling its inventive quick-connect manifold assemblies and disposable fluid separation modules in 1997, as part of the IntelliGen® dispense pump/photochemical filtration system," (Mem. in Supp. of Mot. for Prelim. Inj. Against Infringement 3.) and has not argued with Pall's assertion that the sales began in the month of April. (See Pall's Sur-Reply in Opp. to Entegris' Mot. for Prelim. Inj. 5, n.7; Entegris, Inc.'s Resp. to Pall Corp.'s Surreply 4–5.) For present purposes, it is enough that Pall has raised a substantial question that the product was on sale more than one year before the filing of the July 10, 1998 application that resulted in the '907 Patent.

17

is found in the various documents." Zenon Envtl., Inc. v. U.S. Filter Corp., 506 F.3d 1370, 1378 (Fed. Cir. 2007) (quoting Advanced Display Sys., Inc. v. Kent State Univ., 212 F.3d 1272, 1282 (Fed. Cir. 2000) (emphasis added)). Thus, the incorporation of the '789 Patent was limited to such material within it as was particularly identified. It is clear from the language quoted above that the reason the '770 Patent referred to the '789 Patent was to describe (and thus to incorporate) the preferred type of separation element — i.e., the filtering element itself. The reference to the '789 Patent had nothing to do with connectors in general or gas vents specifically. For the terms of the '789 Patent as to the connectors or vents to be incorporated, a specific statement to that effect would have been required. See id.

The '667 Patent is not entitled to the '770 Patent's priority date if it the '770 Patent does not disclose a gas vent. See 35 U.S.C. § 120 ("An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States … which is filed by an inventor or inventors named in the previously filed application shall have the same effect, as to such invention, as though filed on the date of the prior application"); Zenon Envtl. Inc., 506 F.3d at 1378 (to be entitled to the priority date of an earlier patent, "continuity of disclosure must have been maintained throughout a chain of patents…."). It therefore seems likely that the '667 Patent is entitled only to the priority date of July 10, 1998, when the application that resulted in the '907 Patent was filed. If the IntelliGen product was on sale in

April 2007, it would have been "on sale in this country, more than one year prior to the date of the application for patent…" and therefore the '667 Patent would be invalid under 35 U.S.C. § 102(b).[6]

### C.   Enforceability

Because I have concluded that Pall has raised a substantial question as to validity which Entegris has failed to show lacks substantial merit, it is not necessary to consider Pall's arguments as to prosecution laches and inequitable conduct at this stage.

## VI.   Conclusion

For the foregoing reasons, Entegris has not shown that it has a reasonable likelihood of success on the merits of its infringement claim because substantial questions as to validity exist. Accordingly, its motion for a preliminary injunction (dkt. no. 5) is DENIED.

It is SO ORDERED.

   /s/ George A. O'Toole, Jr.
United States District Judge

---

[6] The parties have focused almost entirely on claim 2 of the '667 Patent, but claim 1 is also at issue. Pall argues that claim 1 of the '667 Patent is invalid as anticipated by U.S. Patent No. 6,048,454 ("Jenkins"). Entegris argues that Jenkins is not prior art because the '667 Patent had an earlier priority date than Jenkins, which was filed on March 18, 1997. However, since it appears that the '667 Patent is only entitled to a priority date of July 10, 1998, Jenkins would qualify as prior art. In fact, the U.S. Patent Office rejected this claim as anticipated by Jenkins, but then found that Jenkins was not prior art because of its 1997 filing date. (See Notice of Filing of Ex.'s to Pall Corp.'s Opp. to Entegris' Mot. for Prelim. Inj., Ex. 10, at 31).